## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JAN MOUZON
4217 19th Place. NE,
Washington DC 20018

SARAH COE
806  Olivos Drive
San Gabriel, CA 91775

JAN STEICH
900 Aqua Isles Blvd. F7,
Labelle, FL 33935

PATRICIA BENNETT
12130 Wedge Drive
Ft. Myers, FL 33913

ROSALIE TECKTIEL
14 South Prospect St. #408
Roselle, IL 60172

ALICE LARGEN
2841 Homette Place
Waldorf, MD 20601

LORRIE HURST
24317 Hilton Place
Gaithersburg, MD 20882

RACHEL DONDERO
4201 Lee Hwy #701
Arlington, VA 22207

MICHELE URAM
18 Sunridge Drive
Coraopolis, PA 15108

KRIS STEINBAUER
8077 Potomac Drive
Colorado Springs, CO 80920

JUANITA  HUMBERTSON
128 Stephanie's Place
Falling Waters, WV 25419

No. _____

**CLASS ACTION COMPLAINT**

DEMAND FOR JURY TRIAL

AL OLIVERIA
2000 Mahogany Wood Trail
Knoxville, TN 37920

NANCY MOORE & STANLEY MOORE
8013 Oak St.
Manassas, VA 20111,
Individually and on Behalf of All Others
Similarly Situated,

                       Plaintiffs,

    vs.

RADIANCY, INC.
100 Lakeside Drive, Suite 100
Horsham, PA 19044

                 Defendant

## CLASS ACTION COMPLAINT

## I.  INTRODUCTION

1)    This action is brought by Plaintiffs Jan Mouzon, Sarah Coe, Jan Steich, Patricia Bennett, Rosalie Tecktiel, Alice Largen, Lorrie Hurst, Rachel Dondero, Michele Uram, Kris Steinbauer, Juanita Humbertson, Al Oliveria, Nancy Moore, and Stanley Moore, individually and on behalf of all other purchasers of the no!no!™ Hair removal device (referred to herein as "no!no! Hair" or the "Product") manufactured and distributed by the Defendant Radiancy Inc. (herein "Radiancy").  Plaintiffs bring this action as a nationwide class action, or alternatively, as subclasses consisting of those Class Members residing in the District of Columbia, California, Illinois, Florida, Maryland, Virginia, Pennsylvania, West Virginia, Colorado, and Tennessee.

2)      Radiancy has marketed, promoted, warranted, and sold no!no! Hair as, among other things, akin to "laser" hair removal or "professional" hair removal treatments, "superior" to shaving, and capable of permanent or "long term" hair removal by "suppressing" hair growth.

3)      In particular, Radiancy has claimed, among other things, that:

• the no!no! Hair "conducts heat down the hair shaft and into the follicle" and that "[l]ike laser and IPL [intense pulsed light] treatments, the heat gradually disrupts the hair growth cycle";

• the signal "disrupts the cell communication [responsible for stimulating hair growth] between the bulge and root";

• the no!no! Hair suppresses, slows, or reduces hair regrowth on a long-term or permanent basis;

• this reduction of hair regrowth is substantial, "up to 94%";

• the no!no! Hair causes the hairs that grow back to be finer and lighter than before treatment;

• the no!no! Hair operates like a laser and produces results comparable or even superior to the results delivered by lasers;

• the no!no! Hair is a "professional" device embodying "Thermicon" technology; and

• the no!no! Hair is backed by clinical studies purporting to support these representations.

4)      In actuality, however, all of these claims are false.  No!no! Hair is a device containing a heated wire that merely singes the hair off of a user's body and does not (and cannot) destroy the hair follicle or suppress the hair's ability to regrow.  In addition, no!no! Hair is no more effective than a $2.00 razor in achieving long lasting hair removal.

5)      Despite the fact that no!no! Hair is only as effective as a razor (which Radiancy fails to disclose), Radiancy charges between $250.00 and $310.00 for the no!no! product.

6)      The only way Radiancy has been able to charge such a huge premium for no!no! Hair is through a massive and deceptive marketing campaign, in which it spent millions of dollars

3

on television and the Internet advertisements that misrepresent and distort the characteristics of its device.

7)       The complete falsity of Radiancy's representations was only recently exposed when Radiancy was sued by a competitor under the Lanham Act, 15 U.S.C. §1117, for false advertising. The court in that action refused to seal the evidence of Radiancy's deceptive conduct outlined in its internal documents and, for the first time, the truth behind Radiancy's misrepresentations was revealed.

8)       Plaintiffs, on behalf of themselves and the Class, seek damages and injunctive relief due to Defendant's ongoing and continuing violation of state statutory and warranty laws.

## II.  JURISDICTION AND VENUE

9)       Jurisdiction and venue is founded on 28 U.S.C §1332(d)(2),(5) and §1397(a).  This court has original jurisdiction over this class action under 18 U.S.C §1332(d), which under the provisions of the Class Action Fairness Act ("CAFA") explicitly provides for the original jurisdiction of the Federal Courts in any class action in which any member of the plaintiff class is a citizen of a State different from any defendant, and in which the matter in controversy exceeds the sum of $5,000,000.00 exclusive of interest and costs.

10)      The total claims of individual class members in this action are in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. §1332(d)(2),(5).  More than two-thirds of all of the members of the proposed Plaintiff Class in the aggregate are citizens of a State other than the District of Columbia, where this action is originally being filed, and the total number of members of the proposed Plaintiff Class is greater than 100, pursuant to 28 U.S.C §1332(d)(5),(b).  Diversity of citizenship exists under CAFA as required by 28 U.S.C. §1332(d)(2)(A).

11)     Venue in this judicial district is proper pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district and Defendant intentionally presented itself in the District of Columbia through its marketing, promotion, and sales of the product in this jurisdiction, to render the exercise of jurisdiction by this court consistent with traditional fair play and substantial justice.

## III.  PARTIES

### A.  Plaintiffs

12)     Plaintiff Jan Mouzon is a resident of the District of Columbia.  Plaintiff Mouzon purchased the Product between June 2010 and April 26, 2011.

13)     Plaintiff Sarah Coe is a resident of California. Plaintiff Coe purchased the Product on or about June 1, 2012.

14)     Plaintiff Patricia Bennett is a resident of Florida.  Plaintiff Bennett purchased the Product on or about May 31, 2012.

15)     Plaintiff Jan Steich is a resident of Florida.  Plaintiff Steich purchased the Product on or about December 6, 2013.

16)     Plaintiff Rosalie Tecktiel is a resident of Illinois.  Plaintiff Tecktiel purchased the Product on or about April 20, 2013.

17)     Plaintiff Alice Largen is a resident of Maryland.  Plaintiff Largen purchased the Product on or about February 17, 2012.

18)     Plaintiff Lorrie Hurst is a resident of Maryland. Plaintiff Hurst purchased the Product on or about July 9, 2012.

19)     Plaintiff Rachel Dondero is a resident of Virginia.  Plaintiff Dondero purchased the Product sometime shortly before July 22, 2012.

20)     Plaintiffs Nancy Moore and Stanley Moore are residents of Virginia.   Plaintiff Stanley Moore purchased the Product for his wife Nancy Moore on or about December 7, 2012.

21)     Plaintiff Michele Uram is a resident of Pennsylvania. Plaintiff Uram purchased the Product on or about April 10, 2013.

22)     Plaintiff Kris Steinbauer is a resident of Colorado. Plaintiff Steinbauer purchased the Product on or about September 6, 2012.

23)     Plaintiff Juanita Humbertson is a resident of West Virginia. Plaintiff Humbertson purchased the Product on or about November 4, 2012.

24)     Plaintiff Al Oliveria is a resident of Tennessee. Plaintiff Oliveria purchased the Product on or about March 24, 2012.

### B.  Defendant

25)     Defendant Radiancy, Inc. ("Radiancy") is incorporated in Delaware and has its headquarters and principal place of business in Orangeburg, New York.  Radiancy also has offices in Hod-Hasharon, Israel, that are used for marketing, operations, and research and development.

26)     Radiancy was founded in 1998.  In 2011, PhotoMedex, Inc. (Nasdaq: PHMD) announced a merger agreement with Radiancy, whereby Radiancy became a wholly owned subsidiary of PhotoMedex.

27)     Radiancy's consumer distribution segment in North America had sales of approximately $33.8 million for fiscal year 2010, and $71.8 million for the nine months ending September 30, 2011, the vast majority of which were from the no!no! device.  Radiancy uses a mix of direct-to-consumer advertising that includes infomercials, commercials, catalog and Internet-based marketing campaigns.

28)     Radiancy's direct-to-consumer revenues during the 2010 fiscal year were $29.9 million compared to $500,000.00 for fiscal year 2009.  Radiancy touted that this increase was due to the successful launch in February 2010 of its infomercial and online marketing campaigns of the no!no! device.

29)     As a result of this marketing blitz, in 2010, Radiancy's selling and marketing expenses increased by $24.5 million, or approximately 503%, from $4.5 million to $29 million. The bulk of these marketing expenses were devoted to the false and deceptive claims described herein.

### IV.  COMMON FACTUAL ALLEGATIONS

**A.  Physiology of Hair and Hair Removal**

30)     Each human hair emerges from an individual hair follicle, a tube-like structure that terminates at the "bulb," where the hair shaft is attached.

31)     Part of the way up the follicle is the "bulge," a structure that functions essentially as the command center for the follicle and initiates the creation and growth of a hair within the follicle.



32)   During the "anagen" or growth phase of a hair cycle, the hair grows upward, emerges from the end of the follicle at the skin surface, and continues to grow out. After a period of weeks to months, depending on which part of the body the hair is growing from, the hair follicle enters the "catagen" or regression phase of the growth cycle, during which growth ceases.

33)   Shortly thereafter, the follicle enters the "telogen" or resting phase of the cycle, during which the hair detaches from the follicular bulb and is eventually extruded. The follicle then enters anagen phase, and the process begins anew.  (The diagram reproduced below applies only to scalp hair in its references to the duration of each phase, but it is generally applicable in its visual depiction of the various phases of hair growth.)



34)   At any point in time, some hairs in a given area are in anagen phase, some are in catagen phase, and the rest are in telogen phase.  Over time, all follicles will produce hairs, but at any moment, the visible hairs in an area of the body represent only a portion of the total number of follicles in that area.

35)   The skin, hair shaft, follicle, and surrounding tissue all contain melanin, a substance that is responsible for skin and hair color and which absorbs light energy according to its absorption

spectrum.  Darker skin and hair contain more melanin than lighter skin and hair, and the hair and follicle generally contain more melanin than do skin and the tissue surrounding the follicle.

36)     Lasers, which operate at wavelengths that penetrate below the skin surface, take advantage of the difference in the amount of melanin in the hair and hair follicle as compared with the skin and surrounding tissue: the laser light energy is absorbed more by a hair follicle and shaft than by the surrounding tissue because of the differential amounts of melanin, a process known as "selective photothermolysis."

37)     In the short term, the energy absorbed by the melanin damages the hair bulb (base), causing the hair shaft to detach from the bulb and, eventually, to fall out. More importantly, selective photothermolysis permanently damages the follicular bulge, disabling it from regrowing hair.

38)     Laser hair removal is known to be more effective on hairs that are in the anagen phase.  Therefore, laser hair removal is typically performed in a series of treatments spaced over time so that each follicle receives treatment at the stage when it is most susceptible. Each subsequent treatment provides permanent hair reduction to a certain percentage of hairs. More treatments provide more coverage.  To the extent hairs do grow back after treatment, they tend to be finer (i.e., smaller in diameter) and lighter in color.

39)     Laser hair removal has been available in the United States in physicians' offices since 1997, when the U.S. Food and Drug Administration (FDA) cleared the first laser hair removal devices for marketing for permanent hair reduction. Today, licensed medical professionals nationwide (and worldwide) perform laser hair removal, and the safety and efficacy of laser hair removal devices has been well established. There is also an over-the-counter laser hair removal device approved by the FDA, made and sold by Tria Beauty Inc.

40)     Laser hair removal treatments cost significantly more than no!no! hair removal devices which contain no lasers and do not perform the same functions as lasers.

**C.  Radiancy Launches No!No! Hair**

41)     Radiancy first launched its no!no! hair removal device in South America in 2004. It brought the product to the U.S. home use market in 2007 after Dolev Rafaeli became its CEO, and it marketed the device in the United States under his direct supervision and control.

**1.  Radiancy Seeks to Avoid FDA Approval**

42)     The FDA regulates all "devices" that fall within the definition set forth in Section 201(h) of the Federal Food, Drug, and Cosmetic Act ("FDC Act"), including any "instrument, apparatus, implement, machine, contrivance" which is "intended to affect the structure or any function of the body of man."  21 U.S.C. §321 (h).  With certain exceptions not relevant here, a medical device may not be introduced into interstate commerce without approval by the FDA of a premarket application or clearance by the FDA of a premarket notification under Section 510(k) of the FDC Act.

43)     In a Section 510(k) notification, a company proposing to distribute a medical device in interstate commerce must demonstrate that its device is "substantially equivalent" to a previously legally marketed device, referred to as a "predicate device."  The device may not be legally marketed unless and until the FDA issues an order declaring the device that is the subject of the Section 510(k) notification to be substantially equivalent to the predicate identified in the submission.

44)     To establish substantial equivalence, the Section 510(k) notification must, among other things, demonstrate to the FDA's satisfaction that any technological differences between the new device and the predicate device do not render the new device less safe or effective than the

predicate device.  The evidence to make such a showing may include human clinical testing or other appropriate scientific data.  *Id.* §360c(i)(1).

45)     A section 510(k) clearance sets forth the specific indications for use or "cleared indications," which must be included in the labeling of a device.  *See* 21 C.F.R. §§ 807.87(e), 807.92(a)(5).  Other statements regarding the features and benefits of the device also may appear on the labeling and in advertising, providing they are truthful and not misleading.

46)     In May 2004, Radiancy requested a meeting with the FDA regarding a 510(k) exclusion from the requirements of FDA standard testing for safety and efficacy for its no!no! Hair device.  Radiancy approached the FDA through Radiancy's attorneys at the District of Columbia law firm Hogan & Hartson (now Hogan Lovells), who specialized in representing clients before the FDA.

47)     In its submission to the FDA (which was not available to the public), Radiancy sought to escape the FDA's scrutiny and regulation by claiming that the device was not a laser (which *would* require 510(k) approval) and instead was a "cosmetic appliance comparable to a mechanical hair clipper or shaver" that "physically removes hair in contrast to other products that rely on depilating chemicals or light treatment." Radiancy further advised the FDA, "Radiancy does not intend to claim an intended use for permanent hair reduction at this time."

48)     In a supplemental submission to the FDA dated August 2, 2004, Radiancy repeated that it would not make a claim of permanent hair reduction.  Radiancy stated that it "has not determined if or to what degree any hair growth may be delayed and is not seeking an intended use for the permanent hair reduction . . . " and again, "claims related to permanent hair reduction are not being sought." Further, Radiancy declared "the device effectively trims the hair just above

the skin surface resulting in minimal energy delivery to the body." In addition, Radiancy stated that the no!no! device "would demonstrate hair removal comparable to a mechanical hair clipper."

49)     The FDA allowed Radiancy to sell the no!no! device as an over-the-counter ("OTC") consumer product hair removal device which did not require 510(k) clearance as a medical device, "as long as the company makes no claims regarding permanent hair removal or hair reduction claims," according to an email dated October 25, 2004 from the FDA's point person, Richard Felten, to Radiancy's representatives.

50)     As discussed in further detail below, the statements in Radiancy's submissions to the FDA starkly contradict the claims that Defendant Radiancy has made to consumers in their advertising and promotional materials.

### 2.  Radiancy Searches out Marketing Partners.

51)     As it was seeking clearance from the FDA, Radiancy also sought partners to assist in marketing and selling its no!no! hair device.

52)     In June 2005, Radiancy approached Procter and Gamble ("P&G") about becoming a partner in its no!no! Hair device given its Braun/Gillette brand, but Radiancy was emphatically turned down.

53)     Internal emails at Braun/Gillette show they did not believe the product to be effective. In an email dated June 11, 2005 from Fabian Tenenbaum (former Radiancy Vice President) to Dan Almagor, former Radiancy CEO, and others, Tenenbaum stated, "Unfortunately the study conclusions where [sic] disappointing – the NoNo failed to show any hair growth delay . . . ."

54)     An email dated July 18, 2005, from Hans Brocker (at Braun/Gillette) to Fabian Tenenbaum, attached an assessment of no!no! Hair, which stated "[t]he heat generated by the

heated wire cannot be transmitted through the hair to the follicle to reduce hair growth [since t]he thermal conductivity of hair is to[o] low."

55)     Thus, Radiancy knew of the problems with its no!no! products as early as 2005.

56)     Another company, Reckitt Benckiser, told Radiancy the same thing.  In an email exchange dated March 15, 2006, Frederick De La Torre, an R&D Technology Manager at Reckitt Benckiser, told current CEO Dolev Rafaeli, "We have tested No No internally on panelists and our assessment was that . . . it wasn't good enough compared to existing cheaper methods of hair removal (shaving or depilatory creams) in terms of immediate smoothness and long-lasting benefits."

57)     Undeterred by the truth, however, Radiancy eventually launched its no!no! Hair removal device in the United States in September 2007 by marketing results it knew the device could not achieve and which it had told the FDA it would not make.

### 3.  Radiancy's No!No! devices.

58)     Four models of the no!no! Hair have been released in the United States since the product's initial launch.  Each model functions in the same way: the product is comprised of a hand-held, heat-based device consisting of a metal case with an open end, with a wire mounted just inside the opening.  When the device is put into operation, the wire heats up, charring surface hairs with which it comes into contact.  The user is then instructed to use a buffer to remove the charred hair from the skin.

59)     The models differ in minor, non-substantive ways; the basic technology (and the core of Radiancy's false claims asserted in this lawsuit) remains the same for all four models.

60)     The no!no! Hair "classic" model (retail price $249.95), first available in 2004, was Radiancy's first and entry level model. Radiancy asserted that "no!no! Hair Removal Classic™

employs the Thermicon® Brand technology which uses the principle of heat transference, conducting a pulse of heat to the hair shaft, separating the shaft and removing the hair so the signal continues down into the follicle to disrupt hair growth."

61)     As of 2010, the classic model was responsible for 23% of Radiancy's total revenues (down from a high of 70% in 2008).

62)     The classic model came with the following:



63)     Launched in 2009, the no!no! Hair "8800" model (retail price $270.00) was smaller and purportedly allowed users "more flexibility, making hard to reach, round and sensitive areas easier to treat."  Radiancy has claimed that "The 8800 is designed to remove hair, slow down hair regrowth and reduce density.  The product allows the user to select from three treatment levels, and compared to the Classic, is a rechargeable portable product.  The 8800 includes a narrow tip for face and bikini area and is rechargeable."

64)     Revenues from the sales of the 8800 were responsible for 59% of Radiancy's total revenues in 2010 (up from 12% in 2009).

65)     The 8800 model came with the following:

14



66)     Launched in 2011, the no!no! Hair "plus" model (retail price $250.00) consisted of

the "classic" model plus an LCD Status Screen, the ability to choose three different "Treatment

Levels," and a status indicator to determine when the "Thermicon Tip" needed replacing:



67)     The newest no!no! Hair "PRO" model contains an "improved design" which purports to contain "Pulsing Thermicon™ Technology that enables skin to remain cool and comfortable while increasing peak energies by up to 35%."  It comes in two models, the PRO 3 (three treatment levels at a retail price of $290) and the PRO 5 (five treatment levels at a retail price of $310).



68)     Although the models vary in insignificant ways that are irrelevant to the claims at issue in this case, none of them contains a "laser" or is "laser-like" and none of them "disrupt[s] hair growth" or impacts the hair follicle in any meaningful way so as to prevent hair regrowth. The misrepresentations at issue in this case are common to all of the models.

### D.  False and Deceptive Marketing of No!No! Hair.

69)     After no!no!'s introduction to the U.S. market in 2007, sales were initially slow. Defendant realized it needed to launch an aggressive promotional effort to convince people to buy a $250 (or higher) device which essentially just heats a wire and burns a user's hair off.  Defendant

also realized that no one would pay a huge premium for a device that was, in actuality, no more effective than a $2.00 razor.  Thus, Radiancy began an organized campaign to sell the product through deceiving consumers about the nature of the device and its capabilities.

70)     The primary method by which Defendant sold (and continues to sell) the no!no! hair removal device in the U.S. has been through television infomercials that encourage consumers to call its toll-free telephone number to order the product.  These infomercials contain the material misrepresentations discussed herein.

71)     Radiancy also sold (and continues to sell) the no!no! Hair nationally through its own Internet websites at https://www.my-no-no.com and https://www.trynono.com.  Radiancy's websites have contained the material misrepresentations discussed herein.

72)     During the first two-and-a-half years after launching no!no! Hair, Radiancy spent a total of about $536,750 on advertising its product in the United States, relying on promoting the device through retail stores, the Home Shopping Network ("HSN"), online advertisements, and limited print advertising.

73)     In February 2010, however, Radiancy introduced a full-length television infomercial (as well as shorter versions) and, over the next several months, dramatically increased its advertising spending to the point where it was spending as much as $1,000,000 per week on advertising.

74)     Sales quickly spiked and remained high as Radiancy continued to advertise at the multi-million dollar level.

75)     Radiancy's financial data indicates that from May 1, 2008 through December 31, 2011, Radiancy sold 984,991 units and received $156,473,299 in gross revenue from its no!no! Hair products.

76)      Radiancy implemented a number of false, misleading, and/or deceptive statements and omissions in its multi-million dollar marketing campaign touting the no!no! Hair product which spurred its tremendous sales growth.  The marketing message was (and still is) so corrupted by Radiancy's numerous misrepresentations, that every consumer purchaser has been subjected to these messages across all marketing channels, including television, print media, websites, as well as on the product's packaging and in its labeling, when purchasing the product.  These false and deceptive messages have included:

● **Hair reduction and long duration claims**. Radiancy has claimed that the device provides "up to 64% hair reduction"; that "Hair regrowth is reduced by up to 94%"; that the device "reduces hair density up to 64%" or "94%"; and "offers a long-term solution to unwanted hair" and "long lasting results."

● "**Thermicon" claims**. Radiancy misleadingly described the "Thermicon effect" by which the no!no! Hair supposedly works. Radiancy's advertising has described "Thermicon" as a technology that conducts heat down the hair shaft and into the follicle, which disrupts the hair growth cycle and inhibits future hair growth – contrary to its representations to the FDA that the device had no effect below the skin surface.  Radiancy has compared this effect to that of laser and other light-based hair removal treatments, claiming, for example, "[l]ike laser and IPL treatments, the heat gradually disrupts the hair growth cycle slowing down the appearance of hair regrowth." Radiancy also has used graphics or animations to illustrate the "Thermicon effect," including in its infomercials. Radiancy has been advertising this "Thermicon" technology and effect since the no!no! Hair product was first released in the United States in September 2007 and continues to do so.

● **"Laser-like" claims**. In addition to its descriptions of the Thermicon effect, Radiancy has made other claims specifically comparing the no!no! Hair to laser hair removal, and discussing the efficacy of its product in relation to laser hair removal.  For example, Radiancy has claimed that the no!no! Hair provides "laser-like results."  Radiancy also has used phrases such as "like laser and IPL treatments" in its advertisements.  And throughout its advertising, Radiancy has made specific references to its product's suitability on all skin and hair types and states that it is cheaper than professional laser removal.

● **"Professional" claims**. Even where Radiancy does not specifically reference a laser, its advertisements have compared the no!no! Hair to "professional" treatments, describing the no!no! Hair as providing similar or better results at a much lower cost.

18

● **Fake endorsement claims**. Radiancy used its employees and paid endorsers, without revealing their connection to Radiancy, to pose as consumers and provide positive comments on websites to combat the numerous negative reviews of the product that often appeared.

● **Clinically proven claims**. Radiancy repeatedly touted the no!no! Hair as "clinically proven" and the purported long term results as "scientifically validated."  Radiancy also claims that "no!no! is a doctor recommended device that is based on years of research and development."

77)     As described more fully herein, these claims were false, misleading, and deceptive.

   **1.  Hair reduction and long duration claims**

78)     In its labeling and advertising, Defendant Radiancy repeatedly claimed that use of the no!no! Hair resulted not simply in hair removal (such as results from traditional hair-removal techniques like shaving), but resulted in an alteration of the physiological process by which hair normally grows, with destruction of the hair follicle.   These are false claims with no basis in scientific fact.

79)     While it mostly (but not always) refrained from explicit use of the word "permanent," Radiancy repeatedly sought to imply that permanent and long-lasting hair reduction would occur through the use of its products.  For example, Radiancy quantified its claim in large-type banners asserting that use of the no!no! Hair results in "Up To 94% Reduction In Hair Regrowth," or "Up to 94% less hair Regrowth."

80)     In one frequently broadcast television infomercial, Radiancy made the same statement that "with repeated use, hair density can be reduced by up to 94%."

81)     Radiancy further claimed throughout its TV and Internet advertising, both explicitly and implicitly, that this purported near 100% reduction in hair regrowth is "long-term" (and hence, permanent).  For example, on one of Radiancy's web sites, Radiancy promised that

the user of the no!no! Hair would obtain "long-term, professional quality hair removal results," and "guaranteed long-term results."

82)    On Radiancy's other website, Radiancy promised that the user would "get rid of unwanted hair and keep it gone."

83)    Despite the explicit FDA prohibition on the use of permanency in Radiancy's claims, sponsored links purchased by Radiancy from various popular Internet search engines featured banner advertising claiming "permanent" results from use of the no!no! Hair.

84)    One print advertisement included the following claims: "hair grows back much slower and finer"; "[i]t's a treatment process for hair reduction."

85)    Another advertisement stated: "[u]p to 94% reduction in hair regrowth", "[i]t's [l]ong-term", it "transmits a thermal signal to remove hair and inhibit regrowth", "[c]linical studies show you can get up to 94% less hair regrowth"; "[h]air free and loving it."

86)    Likewise, in television commercials, infomercials, and sponsored segments on HSN and QVC, Radiancy spokespersons, including CEO Rafaeli in some of the segments, repeatedly and forcefully reinforced and elaborated these claims of permanent hair removal with statements such as the following:

●"It's been almost two years that I have not had to think about hair removal because of the no!no! Hair"

● "We're talking about hair removal; this is no longer a short-term solution. We're talking about a long-term benefit to having no hair returning."

● "After just a few months of using it, less hair was there, and then I was done, for good - it was gone."

● "You will have a life of freedom from hair."

● "Certainly commit to it, because it's going after all those little hairs. But I'll tell you, once you get them, and once they're gone, and they don't come back, they're gone for good."

● "[I]t's much more permanent than any of the sort of depilatory or epilating agents that people use at home."

87)     Many of these videos have now been removed by Radiancy from the Internet in an implicit acknowledgement of their falsity.

88)     In a solitary and relatively obscure portion of one of its websites, Radiancy contradicts its own widely advertised claim that use of the no!no! Hair removal device produced a substantial long-term or permanent reduction in hair regrowth.  On the website, Radiancy included a link to a lengthy list of "Frequently Asked Questions" or "FAQs."[1]  Buried in the middle of these was the question: "How long do the results last?" and the following answer used to read "After 3-5 months of no treatments, hair might return to pretreatment values.  You can easily maintain results with continued use of no!no! Hair."  At present, it reads "Everyone's hair growth pattern is different.  If you continue to use your no!no! you will see long lasting results."[2]

89)     Even this disclosure was false, however, as no!no! Hair does not prevent hair regrowth for 3-5 months, and Radiancy has never even tested it in any scientific way to determine if this claim is true.   Nevertheless, no such disclosure was included in any of the television commercials or, as noted above, on the other Radiancy websites.[3]  Indeed, this single disclosure did not begin to counteract the ubiquitous and directly contrary claims that that the user of no!no! Hair would enjoy limited hair regrowth in the future, that the user would be able to "get long lasting results," or that "no!no! did just what it said. After a few treatments I started to see a difference in the hair thickness and regrowth."[4]  Or, as Radiancy's now removed videos touted, that "It's been almost two years that I have not had to think about hair removal because of the

---

[1] http://trynono.com/nono-hair-frequently-asked-questions/ (last accessed 4.24.14).
[2] *Id.*
[3] https://www.my-no-no.com (last accessed 4.24.14).
[4] http://trynono.com/the-nono-advantage/ (last accessed 4.24.14).

no!no! Hair," that "after just a few months of using it, less hair was there, and then I was done, for good -it was gone," that "it's going after all those little hairs. But I'll tell you, once you get them, and once they're gone, and they don't come back, they are gone for good," and that "you will have a life of freedom from hair."

90)     Radiancy knew these claims were false as far back as 2005.  In emails dated June 1, 2005, between Fabian Tenenbaum and former CEO Dan Almagor, Tenenbaum stated, "The new data suggests the NoNo does not provide significant hair growth retardation or hair reduction and therefore we need to reevaluate our marketing strategy as a whole.  The value we deliver to our customers with a device that has no long term effect is significantly lower than our original proposition and our pricing strategy should follow accordingly. I would strongly recommend against pursuing short term sales using inaccurate claims."

91)     Radiancy ignored Tenenbaum's advice, and he eventually left the company.

92)     Other employees also expressed concerns about the nature of Radiancy's advertising.  In an email dated June 26, 2008, Sharon Dovev, Radiancy's Director of Marketing and a frequent internal critic of Radiancy's deceptive advertising, told CEO Rafaeli, "Long term means permanent as far as we know, and I do not feel comfortable using it . . . ."

93)     Rafaeli repeatedly ignored his own marketing director's advice (as well as that of his lawyers and the FDA) and approved marketing messages that were designed to deceive consumers.

### 2.  Thermicon Claims

94)     Defendant Radiancy's labeling and advertising purported to offer a scientific explanation for this supposed near l00%, permanent reduction in hair regrowth.  According to Radiancy's promotional materials, no!no! Hair incorporates a "proprietary technology," which

Radiancy has branded "Thermicon" (a pseudo-scientific invented term intended to convey a scientific basis for the claims of efficacy), which Radiancy claimed uses "thermolysis" or "the thermal principle of heat transference" to alter the body's hair-growing function.

95)     Specifically, Radiancy claimed a "Thermicon effect" whereby the "No!no! Hair conducts heat down the hair shaft and into the follicle.  Like laser and IPL [intense pulsed light] treatments, the heat gradually disrupts the hair growth cycle."

96)     In various infomercials, Radiancy asserted that "the signal disrupts the cell communication between the bulge and root," which communication is "responsible for stimulating hair growth."  It further claimed that the No!no! Hair "is actually . . . killing the hair follicle,"[5] that "no!no! Hair's patented Thermicon technology sends a thermal signal to the root, believed to disrupt the communication of regrowth that reduces hair growth over time," and that "no!no! Hair addresses the problem below the surface.  It zaps the hair below the surface and the result is that the hair grows back more slowly, less of it grows back, and what does grow back is very fine."

97)     In information Radiancy supplied to the Securities and Exchange Commission, Radiancy stated: "The filament applies heat to the treatment area, which is conducted to the hair shaft.  Even though the filament reaches very high temperatures, it does not burn the skin due to the various safety features Radiancy has built into each product unit.  The hair shaft is then destroyed by thermolysis, resulting in removal of the hair."

98)     Radiancy lauded these representations.  In an email dated February 3, 2010, from Jon Schulberg to Sharon Dovev, copying CEO Dolev Rafaeli and others, Schulberg stated, "The money shot is really when you see no!no! zap the hair and the yellow light pulse travels all the

---

[5] http://www.doctoroz.com/videos/over-40-breakthrough-fixes-pt-2 (last accessed 4.24.14).

way don [sic] to the root bulb . . . I do think there is no such thing as showing the Thermicon zapping technology too much."

99)    Indeed, while Radiancy recently has taken down some of the most egregiously false statements on its web sites and in YouTube videos, its "Thermicon zapping" claim, complete with video showing the yellow light pulsing into the root bulb as the hair in the root shrivels, remains in a prominent location on one of Radiancy's web sites as of the filing of this complaint.[6]

100)   The video embedded on its own website shows an artist's rendering of the Thermicon "zapping" and a hair follicle shrinking while a voice-over states, "Like laser hair removal, No!No!'s Thermicon technology uses heat to remove the hair to achieve long term reduction in hair regrowth."



---

[6]  http://www.my-no-no.com/nonohair_how.aspx (last accessed 4.24.2014).



101)     These claims are knowingly false, however, and have no scientific basis.  Indeed, if these claims were true and no!no! did actually somehow "zap" and permanently shrink or alter hair follicles, Radiancy would have had to obtain FDA approval before marketing the device in the United States.

102)     Radiancy's own internal analysis concluded that the no!no! Hair does not cause any appreciable heating of the hair shaft below a depth of 200 microns (a micron is 1/1000 of a millimeter or one-millionth of a meter; a typical human hair has a thickness of 40 to 120 microns).  The structures of the follicle responsible for hair regrowth (the bulge and the bulb) reside much deeper in the epidermis (the bulge being around 1,500 microns deep and the bulb being between 2,000 and 7,000 microns deep).

103)     Thus, according to Radiancy's own analysis, the heat produced by the device does not reach anywhere near the bulge or bulb of the follicle.

104)     The advanced "Thermicon technology" contains nothing more than a heated wire which singes hair off of a user's body.  It does not "disrupt" hair follicles or prevent hair regrowth.

Radiancy has always known this, and that is why it told the FDA the device had no effect on hair regrowth.  Nevertheless, Radiancy continues to tell consumers the exact opposite.

### 3.  "Laser-Like" Claims

105)    Although the no!no! Hair does not incorporate lasers or laser effect, Radiancy has falsely advertised the no!no! Hair as being "like a laser" for hair removal and the "Thermicon" technology as "laser-like" in a deceptive attempt to wrap itself in technology that *is* actually known to prevent hair regrowth.

106)    For example, in one television infomercial, Radiancy CEO Dolev Rafaeli is shown stating that "Radiancy is the world leader in professional systems used by physicians in physicians' offices and medical spas. After years of research and millions of dollars spent, we managed to miniaturize the technology and come out with a solution that can be used at home," thus suggesting that the no!no! Hair is simply a "miniaturized" version of the laser-based hair removal systems used by dermatological professionals in offices and medical spas.

107)    Radiancy's advertising also has featured a chart that explicitly compares the benefits from using the no!no! Hair with those of, among other things, "laser treatment" without specifying any particular laser-based hair removal system.[7]

108)    One no!no! Hair advertisement was titled, "BETTER THAN LASER?"  Another advertisement claimed: "LASER-LIKE RESULTS!' DISCOVER THE FIRST AT-HOME ALTERNATIVE TO LASER HAIR REMOVAL!"

109)    In addition, Radiancy has purchased sponsored links on Internet search engines that contain banner ads promoting the no!no! Hair as providing "Laser-like Results."

---

[7] http://trynono.com/the-nono-advantage/ (last accessed 4.24.14).

110)   In addition to raising concerns about permanency claims, former Radiancy executive Tenenbaum provided similar concerns about Radiancy's marketing using "laser" comparisons.   In an email dated July 5, 2005, between Fabian Tenenbaum, Colleen Canaday (former Radiancy Marketing Manager) and others, Tenenbaum wrote, "I don't like the 'Professional' moniker – at this point we cannot offer 'laser-like' results."

111)   But it was clear that the purpose of comparing no!no! to lasers was to reinforce the implied permanency claims which Radiancy knew it could not state directly.   In an email dated September 12, 2006, from Dolev Rafaeli to Eddie Mishan, Rafaeli stated, "I am sure that with smart wording the ad can convey the message without making direct PERMANENT and REDUCTION claims.   The heading 'Better Than Laser?' is one way of doing this."

### 4.  "Professional" Claims

112)   Radiancy's labeling and advertising also has incorporated a number of claims stating or implying that the no!no! Hair was categorically equivalent or superior to professional hair removal systems in doctors' offices, including the following:

● "The great thing about the no!no! Hair is that it has been shown scientifically to actually have an effect similar to what lasers accomplish in the dermatologist office."

● "Now you finally have a solution that, lets you achieve professional hair removal results - in the comfort of your own home. You no longer need to hassle with the inconvenience and high cost of expensive and time consuming in-office treatments. Instead, you can use the no!no! whenever and wherever you want - as often as you like!"[8]

● "no!no!™ offers a solution to unwanted hair, answering the ever-growing demand for professional, pain-free hair removal that can be performed in the comfort and convenience of the home. no!no! instantly removes hair and stays away for weeks with no pain, no mess and no chemicals."[9]

---

[8] https://trynono.com/ (last accessed 4.24.14); http://trynono.com/the-nono-advantage/ (last accessed 4.24.14).
[9] http://www.my-no-no.com/hair_removal.aspx (last accessed 4.24.14).

113)     Radiancy has claimed repeatedly that the no!no! Hair is a "professional treatment," that it is the "only at-home professional system for long-term hair removal," and that no!no! Hair "is a breakthrough in hair removal because it delivers the same professional results using professional technology right in the privacy of your home."

114)     No!no! Hair is not used by dermatologic professionals, with the possible exception of professionals paid by Radiancy to act as endorsers, nor does the no!no! Hair deliver the same results as any professional systems for the reduction of hair regrowth.

### 5.  Fake Endorsement Claims

115)     Radiancy's sales personnel and employees engaged in an organized practice to post or call in fake consumer endorsements so as to make it appear that there was widespread customer satisfaction with the no!no! product, when the opposite was true.

116)     Employees were even counseled to make "stupid" comments, which would give them the veneer of authenticity.  For example, in one email dated January 27, 2011, from Radiancy employee Jaimee Given to several other Radiancy employees, Given stated, "Unfortunately, our SEO people cant post reviews (and we can't make up fake Amazon accounts bc you actually have to had purchase something) so I need everyone's help in going on and writing how much you LOVE your no!no! . . . right [sic] like a stupid consumer...and make sure to give 5 stars for each one."

117)     In an email dated dated February 28, 2011, from CEO Dolev Rafaeli to Samantha Kohl, Rafaeli asked Kohl, "Can you call as Nancy from NY that bought online from Radiancy and wanted to tell everyone how great the product is?"

118)     In an email dated July 11, 2011, from Chubi Aharons to Sharon Dovev, discussing online posts about the no!no! Hair, Dovev inquired, "Did you post a comment???" Aharons responded, "Answered them."

119)     In an email dated July 28, 2011, from Aharons to Given, Kohl, Dovev, and others regarding online posts about the no!no! Hair, Aharons stated, "I am reply 17," and stated, "Please respond to this post, but do not lump up the times.  Too many positives at once will look funky.  This evening or tomorrow, I am going to respond as someone from the company."

120)     In an interoffice email dated July 31, 2011, Radiancy employees were coached on how to post online compliments posing as consumers.

121)     This practice had many employees participating in posting complimentary reviews so as to deceive potential customers that they were actual customers, when in fact they were employees of Radiancy.

### 6.  "Clinically Proven" claims

122)     Radiancy's carefully orchestrated claims regarding the effectiveness of the no!no! Hair in achieving near 100% permanent reduction of hair regrowth were reinforced by presentations stating or implying that the effectiveness of the Radiancy Device was clinically tested and proven, such as:

● "Clinical studies show it inhibits hair regrowth and can reduces [sic] hair density by up to 94% with no pain, no mess and no chemicals."

● "What impresses me about no!no! Hair is all the research and clinical studies that have been done to prove that it really does work.  A more recent study shows that no!no! Hair reduces hair up to 94% when used long term."

● "Clinical data has shown that with repeated use, hair density can be reduced by up to 94% and the hair that does grow back comes back thinner and finer."

● "The great thing about the no!no! Hair is that it has been shown scientifically to actually have an effect similar to what lasers accomplish in the dermatologist office."

&bull; A "recent study shows that no!no! Hair reduces hair up to 94%."

123)    Radiancy's website lists three papers under the heading "Clinical Studies."[10]  From a review of these papers, it is apparent that none of these studies demonstrates (i) that use of the Device results in significant reduction of "hair regrowth"; (ii) that this reduction is substantial and can be as much as 94%; (iii) that the reduction is "long-term" or "permanent"; (iv) that the reduction occurs as a result of heat transference, or the "Thermicon effect," whereby "no!no! Hair conducts heat down the hair shaft and into the follicle" and "the heat gradually disrupts the hair growth cycle"; or (v) that the no!no! Hair has "an effect similar to what lasers accomplish in the dermatologist office."

124)    Nor did Radiancy cite nor have any other scientific basis for its claims.  Tellingly, Radiancy has not submitted any of these studies to the FDA or otherwise attempted to obtain clearance from FDA for the no!no! Hair as a device for permanently reducing hair regrowth, and there is no such FDA approval for the no!no! Hair for any such claim.

125)    One study that Radiancy relies on as providing "scientific proof" supporting its permanent hair loss representations appeared in the *Journal of Drugs in Dermatology* in August 2007.  This study concluded that the "thermicon device results for hair removal of the legs appeared to be comparable to those laser devices."

126)    This study was funded by the Defendant Radiancy and written by a member of the Defendant's "scientific advisory board," Dr. James M. Spencer.  This study, which served as the

---

[10] *See* FAQ page at http://trynono.com/nono-hair-frequently-asked-questions/#11 (last visited 4.24.14).  The website identifies the studies as: Clinical Evaluation of Handheld Self-Treatment Device for Hair Removal, James M. Spencer, MD. From the Journal of Drugs in Dermatology: August 2007; Thermicon Clinical Evaluation: no!no! Hair Removal System, Rodolfo Klein, MD Santiago, Chile: June 2006; no!no! Thermicon: A Novel, Home-based Hair Removal Device, Radiancy Clinical Department: May 2006.

primary scientific basis of the Radiancy's efficacy claims, lacked any scientifically acceptable methodology.

127)    Spencer's study had only twelve volunteers, lacked any control group, and followed them for only 12 weeks after the end of treatment - far too short a time to reach any conclusion about the lasting effects of the device since hair growth typically follows a cycle lasting multiple months.

128)    None of the "studies" listed by Radiancy on its website provided any basis for Radiancy's claims of "clinical" evidence of efficacy in reducing hair regrowth.

129)    An actual scientific study of the no!no! Hair device was conducted by Dr. Brian Biesman of Vanderbilt University Medical Center.

130)    The 2006 Biesman study had sufficient power, a control group, twice weekly treatment for eight weeks, and trained independent third party evaluations.  It concluded: "The hot wire device did not induce long-term reduction in the hair count, low or delayed hair growth, alter the thickness or color of the hairs that do regrow, or offer any long term benefit relative to shaving."

131)    While the Spencer study was uncontrolled, the Biesman study was a controlled rigorous measurement of the no!no! Hair device that concluded that shaving versus the no!no! Hair (hot wire) device showed no statistical difference in hair count, hair size and in visual assessment of hair characteristic such as fineness/thickness and lightness/darkness.  The Biesman study showed that there was "no evidence for an inhibition in regrowth rate after the initial regimen."

132)    Dr. Biesman explained that follicular injury is a threshold effect which he defined as sufficient energy delivered to the follicle to at least induce minimal injury that may accumulate over time in repeated minimal injuries. "If 16 treatments demonstrate no detectable changes to follicular function, it suggests that insufficient energy is being delivered to the follicle to produce even a

minimal injury  and therefore that additional treatments are not likely to eventually accumulate a meaningful benefit."

133)    Radiancy's own D.C.-based lawyers told Radiancy that the principal study (Dr. Spencer's) on which Radiancy relied was insufficient to prove claims of hair reduction.

134)    In an email from John Smith at Hogan & Hartson to Margaret Fourte, former Radiancy Director of Clinical Affairs, Smith (commenting on some proposed advertising text including the claim "Over time, hair regrowth was reduced up to 45%!") stated, "as outlined in an October 25, 2005 [sic], email from Richard Felten at FDA, the agency agreed that the Thermicon can be regulated as a consumer product, 'as long as the company makes no claims regarding permanent hair removal or hair reduction.' The draft materials below arguable [sic] make such claims and appear contrary to this agreement under which the Thermicon was considered a consumer product and not a medical device.  There are also issues regarding the validity of the data on which the draft material below is based . . . we would recommend that Radiancy not promote the Thermicon using the draft text below."

135)    United Kingdom regulators also informed Radiancy of the Spencer study's shortcomings and demanded that Radiancy cease making unsubstantiated claims.

136)    The U.K.'s Committee on Advertising Practice regarding the no!no! Hair's clinical trials states, "We have examined the trial and consider that it does not provide substantiation for the efficacy claims being made in the advertisement for no!no!" and "we question whether the 12 people on whom the no!no! was tested is large enough sample for the results to be considered statistically significant."

### E.  Consumers Complained About the No!No! Product

137)     The Internet is flooded with thousands of complaints about no!no! Hair by consumers who were deceived by Radiancy's misrepresentations.

138)     Radiancy and its distributor HSN received an extraordinarily high percentage of product returns (above 40%) and an equally unusual number of customer complaints about the no!no! Hair's ineffectiveness.

139)     In an email exchange dated February 26, 2008, from Andrea Knight at HSN to Skip Borghese, Radiancy consultant for HSN advertising, HSN stated, "[t]he no!no! is now returning at 42% which is incredibly high for Personal Care. Biggest complaints are that it doesn't remove stubble leaving a smooth feeling also the burning smell of hair."

140)     Sharon Dovev replied, "This is the dilemma we have on our hands: We want to sell, and that means to excite people. No sale can happen without excitement. BUT - we want to prevent disappointment and returns. The way I see it we have no other way but to give more realistic expectations to the viewers, say that sometimes we don't get 100% smoothness, and talk about incorporating shaving (just as skip's wife does) into the hair removal routine. As long as we keep selling the 'amazing smoothness' AND the long term result we sound like something that is too good to be true, and that doesn't exist in reality."

141)     HSN undertook a no!no! hair customer satisfaction survey in September 2008.  More than half of respondents who purchased the No!No! device for themselves reported dissatisfaction with the device; approximately 1 out of 4 customers cited 'failure to remove hair' as the reason for dissatisfaction; and 68% of respondents returned their No!No! device.

142)     An email dated October 10, 2008, attached the results of HSN's no!no! hair customer satisfaction survey and stated, "here are the key takeaways: 'More than half of respondents who

purchased the No!No! device for themselves reported dissatisfaction with the device'; 'Approximately 1 out of 4 customers cited 'failure to remove hair' as the reason for dissatisfaction'; and '68% of respondents have returned their No!No! device.'"

143)     The problems remained.  An email dated February 2, 2010, between Dolev Rafaeli and Sharon Dovev regarding HSN feedback on no!no! Hair, noted that "People say they are getting burned on the face"; "People are reporting poor customer service from the my no!no! help line"; and the "Majority of the reviews say they sent back the unit and most are giving us 1 star because they cannot give '0.'"

144)     Likewise, in Radiancy's own customer satisfaction surveys, over 50% of customers were highly dissatisfied with the product, with a large proportion reporting "no results" or that it didn't work as expected.

145)     There also were consistently negative product reviews of the no!no! Hair posted on Internet websites, with the average rating just 1.5 out of 5 stars on amazon.com and just 2 out of 5 stars on hsn.com.

**F.  Employees Internally Acknowledge Radiancy's Misleading Advertisements**

146)     In addition to those examples discussed above, Radiancy's own employees warned CEO Rafaeli that Radiancy's claims were false, but Rafaeli ignored those warnings and proceeded with his campaign of misrepresentations.

147)     For example, one email dated February 11, 2010, from Sharon Dovev, Radiancy's Director of Marketing, to Jon Schulberg and Dolev Rafaeli, stated, "At 3:06 VO says 'you can get the results of laser hair removal', which is simply not true."

148)     Dovev also raised the problem with laser comparisons in later email exchanges.  In an email dated February 3, 2010 between Dovev, Rafaeli, Schulberg and others, Schulberg stated,

"The thinking was that most people do not understand or care that no!no! uses just heat . . . the key benefit is that with [no!no!] they can get professional long term hair removal results at home. The fact that women associate laser being the best solution for long term hair removal, (at this point of the show) works to our advantage in setting up our breakthrough promise."  Dovev responded, "Re laser - I agree that people don't care nono uses heat, but think this verbiage is misleading because it sounds like nono is very similar to laser, and it is not."

149)    In an email dated August 26, 2007, from Sharon Dovev to Alyssa Kobel at Sephora (copying Dolev Rafaeli and others), Dovev stated, "We know that 'up to 64% means that only in some cases, this is the result.  Once you put this in numbers, it looks as if that's the promised result. I would take it off."

150)    In an email dated March 6, 2008, from Sharon Dovev to Skip Borghese and Dolev Rafaeli, Dovev stated that "it took literally seconds/instant" is "not true, it's a time consuming process"; that "softer smoother results, better than shaving/waxing" is "NOT TRUE!!"; and that "most people will definitely have stubble after 2 weeks."

151)    In an email dated November 1, 2010, from Dovev to Rafaeli, regarding a no!no! Hair Skymall advertisement, Dovev stated, "The title [get rid of hair and keep it gone] is graphically catchy, but is misleading and sets the wrong expectations (just like the 94% hair regrowth.  Later on we will have consumers calling the call center. You know how hard we work to set the right expectations. We might as well say "Hair? Gone" and be the magic company.) This is my professional opinion, and your call."

### G.  Lanham Act Litigation

152)    In 2010, Tria Beauty Inc., a California manufacturer of the only FDA-approved over-the-counter laser hair removal device, sued Radiancy for violations of the Lanham Act, 15 U.S.C.

§1117, due to Radiancy's false advertising of the no!no! Hair removal device as capable of permanent hair removal.  The case settled in 2012.

153)    Although Radiancy eliminated some of the most egregious falsehoods from its advertising in response to Tria's lawsuit, its advertising has continued to feature claims that the no!no! Hair will result in "long-lasting hair removal," "the hair [being] gone for weeks," and "almost no hair [coming] back"; that it "slows down the actual regrowth of hair" and causes "the density and number of hairs [to drop] dramatically."

154)    Radiancy has also continued to make permanency and "laser-like" claims through its various websites, such as the "Thermicon zapping" video discussed *supra* and various media stories featured at http://www.trynono.com, which purport to be independent press "reviews" of the no!no!, but which in fact are no more than public relations pieces from Radiancy.

155)    The "review" page includes a statement purportedly from Ebony magazine describing the no!no!  8800 as containing a "professional strength laser" whose "revolutionary Thermicon technology sends a gentle pulse of heat into the hair shaft and eventually reduces hair growth at the follicle."[11]  A statement on the same page purportedly from Shape magazine says the no!no!  8800 "emits heat that painlessly shuts down the follicle, causing new strands to come in thinner."[12]

### H.  Fraudulent Concealment and Equitable Tolling

156)    Because Radiancy kept its deceptive activities secret until the recently concluded Lanham Act litigation, Plaintiffs and the other Class members were unaware of Defendant's unlawful conduct and the manner in which that conduct affected them.

---

[11]  https://www.trynono.com/ps_ar3/press.aspx (last accessed4.24.14).
[12]  *Id.*

157)   Defendant's affirmative acts alleged herein, including acts in furtherance of its deceptive scheme, were concealed and carried out in a manner that precluded detection.

158)   Defendant's deceptive marketing activities were inherently self-concealing because they involved mischaracterizing its no!no! Hair products.  If Defendant had been open and notorious about the deceptive marketing scheme, the scheme would never have succeeded.

159)   Defendant's limited communications about the deceptive nature of its conduct mostly to the confines of higher-level executives so as to avoid detection.

160)   Plaintiffs and the other Class members could not have discovered the alleged deceptive scheme and Radiancy's knowledge of the same at an earlier date by the exercise of reasonable diligence because Defendant employed deceptive practices and techniques of secrecy to avoid detection of their activities.  Defendant fraudulently concealed its activities by various means and methods, including repeated misrepresentations to Plaintiffs and the Class.

161)   Because Defendant affirmatively concealed its scheme, Plaintiffs and the other Class members had no knowledge until recently of the alleged deceptive activities or of information which would have caused a reasonably diligent person to investigate whether Defendant committed the tortious and other actionable activities detailed herein.

162)   As a result of Defendant's fraudulent concealment of its activities, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the other Class members have as a result of the conduct alleged in this Complaint.

163)   Plaintiffs and the Class could only have possibly learned of their claims when Radiancy's internal documents were first revealed in July 2012 and no Plaintiffs had regular access to court dockets and saw those materials.  As soon as Plaintiffs learned of their claims, Plaintiffs diligently pursued them herein.

37

164)    Because the true facts concerning the no!no! Hair device were concealed by Defendant, and were not and could not have been known to Plaintiffs or any other member of the Class at the time of product purchase, any applicable statute of limitations has been tolled as to Radiancy.

## V.  INDIVIDUAL FACTUAL ALLEGATIONS

165)    Plaintiff Jan Mouzon purchased a no!no! product between June 2010 and April 26, 2011 after viewing Defendant's infomercial in her home in Washington, D.C. Plaintiff saw the infomercial several times in the months before she purchased the Product. Plaintiff relied on Defendant's misrepresentations in the infomercial that the device would remove hair easily, would provide long term hair removal, and would be safe to use, among other misrepresentations.  Her primary reason for purchasing the Product was the misrepresentation that the device would provide permanent or long term hair removal.  Plaintiff reasonably relied on Defendant's representations in purchasing the no!no! product.

166)    Plaintiff Mouzon used the Product several times at her home in Washington, DC and found that the hair grew back and that there was no reduction in hair growth.  Plaintiff found that the product was no more effective than regular methods of hair removal, including shaving and waxing.  The Product also burned her face and left a small scar.  Had Plaintiff known that the Product was unable to prevent hair regrowth and could not live up to its other representations, Plaintiff would not have bought the Product.  As a result of Radiancy's conduct as alleged herein, Plaintiff suffered monetary injuries including but not limited to loss of the purchase price of the device and shipping and handling.

167)    Plaintiff Sarah Coe purchased the no!no! Plus pink on or about June 1, 2012 after viewing a sponsored segment for the device on HSN in her home in San Gabriel, California.

Plaintiff had seen advertisements for the Product at least twice previously. Plaintiff relied on Defendant's misrepresentations in the HSN segment and advertisements that the device was simple to use, effective, permanent like a laser, and that it would save her money on hair removal in the long run, among other misrepresentations. Her primary reason for purchasing the Product was Defendant's misrepresentation that the device would provide permanent or long term hair removal. Plaintiff reasonably relied on Defendant's representations in purchasing the no!no! product.

168)     Plaintiff Coe used the device three times per week for six weeks at her home in California, but it did not provide the promised long-lasting hair removal results. Plaintiff called to try to return the Product, but was told to keep using it and that she was not using the Product at the correct angle. Had Plaintiff known that the Product was unable to prevent hair regrowth, Plaintiff would not have bought the Product. As a result of Radiancy's conduct as alleged herein, Plaintiff suffered monetary injuries including but not limited to loss of the purchase price of the device (approximately $284.94) and shipping and handling.

169)     Plaintiff Patricia Bennett purchased the no!no! 8800 pink on or about May 31, 2012 after viewing an infomercial in her home in Ft. Myers, Florida. Plaintiff made her purchase after seeing advertisements for the Product several times over the course of several months. Plaintiff relied on Defendant's misrepresentations in the infomercial that stated that consumers should have confidence that if they used the no!no! product it would take care of hair problems, that there would be no pain, and that within six weeks hair would be permanently removed with no stubble or regrowth, among other misrepresentations. When Plaintiff called to order the Product, the saleswoman told her that she personally used the Product, it worked, and she loved it. Plaintiff Bennett's primary reason for purchasing the Product was Defendant's misrepresentation that the

device would provide permanent and long-term hair removal.  Plaintiff reasonably relied on Defendant's representations in purchasing the no!no! product.

170)    Plaintiff Bennett used the product several times a day at least three days a week at her home in Florida, increasing the amount she used it over the course of six weeks.  Plaintiff followed the directions when using the Product, but did not see any long term hair removal results. Plaintiff called to try to return the Product, but the salesperson persuaded her to try using it longer to achieve optimal results.  Despite Plaintiff's continued use, the Product never removed hair for longer than regular hair removal methods such as shaving or waxing.  Had Plaintiff known that the Product was unable to prevent hair regrowth and could not live up to its other representations, Plaintiff would not have bought the Product.  As a result of Radiancy's conduct as alleged herein, Plaintiff has suffered monetary injuries including but not limited to the purchase price of the device (approximately $332.80) and shipping and handling.

171)    Plaintiff Jan Steich purchased the no!no! Pro5 chrome on or about December 6, 2013 after viewing an infomercial in her home in Labelle, Florida.  Plaintiff purchased the Product after seeing several advertisements for it.  Plaintiff believed that if the Product continued to be advertised, it must live up to its promises.  Plaintiff relied on Defendant's misrepresentations in the advertisements that after six weeks of continuous use, she would not experience any more hair growth, that the Product works immediately, and that it is easy to use, among other misrepresentations.  Plaintiff Steich's primary reason for purchasing the device was Defendant's misrepresentation that the device would provide permanent or long term hair removal, and she would not have spent so much money on the device if she had not believed that it would be a permanent solution.  Plaintiff reasonably relied on Defendant's representations in purchasing the no!no! product.

172)     Plaintiff Steich used the device for about two months, three to four times per week, at her home in Florida.  The product did not remove the hair at all, and furthermore, it left her face red and irritated.  Had Plaintiff known that the Product was unable to prevent hair regrowth and could not live up to its other representations, Plaintiff would not have bought the Product.  As a result of Radiancy's conduct as alleged herein, Plaintiff suffered monetary injuries including but not limited to loss of the purchase price of the device (approximately $300.00) and shipping and handling.

173)     Plaintiff Rosalie Tecktiel purchased the no!no! Pro silver on or about April 20, 2013 after viewing an infomercial in her home in Roselle, Illinois.  Plaintiff saw multiple advertisements for the product for approximately a year before finally purchasing the device.  Plaintiff relied on Defendant's misrepresentations in the infomercial that the device would slow down hair regrowth and that she would not have to do hair removal maintenance every day, and that the device would provide permanent hair removal after a few months of use, among other misrepresentations.  Plaintiff's primary reason for purchasing the Product was Defendant's misrepresentation that it would provide permanent or long term hair removal.  Plaintiff reasonably relied on Defendant's representations in purchasing the no!no! product.

174)     Plaintiff Tecktiel used the Product several times a week for eight months at her home in Illinois.  It did not remove the hair from her face, and did not slow the growth of hair.  Had Plaintiff known that the Product was unable to prevent hair regrowth and could not live up to its other representations, Plaintiff would not have bought the Product.  As a result of Radiancy's conduct as alleged herein, Plaintiff suffered monetary injuries including, but not limited to loss of the purchase price of the device (approximately $332.75) and shipping and handling.

175)     Plaintiff Alice Largen purchased the no!no! 8800 pink on or about February 17, 2012 after viewing an infomercial in her home in Waldorf, Maryland.  Plaintiff had seen four to five other advertisements prior to purchasing the Product.  Plaintiff relied on Defendant's misrepresentation in the advertisement that using the Product would cause her hair to go away and never come back and that the hair would come off easily, among other misreprsentations.  Plaintiff's primary reason for purchasing the Product was Defendant's misrepresentation that it would provide permanent or long term hair removal.  Plaintiff reasonably relied on Defendant's representations in purchasing the no!no! product.

176)     Plaintiff Largen used the Product for six months, one to two times per week at her home in Maryland.  It did not remove her hair, was very difficult to use, and she found waxing to have better results.  Had Plaintiff known that the Product was unable to prevent hair regrowth and could not live up to its other representations, Plaintiff would not have bought the Product.  As a result of Radiancy's conduct as alleged herein, Plaintiff has suffered monetary injuries including but not limited to loss of the purchase price of the device (approximately $282.80) and shipping and handling.

177)     Plaintiff Lorrie Hurst purchased the no!no! 8800 black on or about July 9, 2012 after viewing an infomercial in her home in Gaithersburg, Maryland.  Plaintiff purchased the Product after viewing the infomercial for the first time.   She relied on Defendant's misrepresentations in the infomercial that the hair would not grow back if she used the product for four to six weeks and then once a month every three months for upkeep, among other misrepresentations.   Plaintiff's primary reason for purchasing the product was Defendant's misrepresentation that the device would provide permanent or long term hair removal. Plaintiff reasonably relied on Defendant's representations in purchasing the no!no! product.

178)   Plaintiff Hurst used the product twice on her face at her home in Maryland, but it cut her and left marks.  She tried the product again and although it removed hair, the hair grew back as quickly as it would using regular hair removal methods such as shaving or waxing. Plaintiff Hurst called to try to return the product, but the salesperson convinced her to buy more buffer pads and creams instead in order to make the product more effective.  Had Plaintiff known that the Product was unable to prevent hair regrowth and could not live up to its other representations, Plaintiff would not have bought the Product.  As a result of Radiancy's conduct as alleged herein, Plaintiff suffered monetary injuries including but not limited to the loss of the purchase price of the device (approximately $378.55), buffer pads and creams, and shipping and handling.

179)   Plaintiff Rachel Dondero purchased the no!no! 8800 silver sometime shortly before July 22, 2012 after viewing an infomercial in her home in Arlington, Virginia.  Plaintiff relied on Defendant's misrepresentations in the infomercial that the Product would provide permanent or long term hair removal, among other misrepresentations.   These misrepresentations were her primary reason for purchasing the Product. Plaintiff reasonably relied on Defendant's representations in purchasing the no!no! product.

180)   Plaintiff Dondero used the device at least two times a week for eight weeks at her home in Virginia, but it did not remove hair and did not reduce hair regrowth.  In addition, the Product was not pain free as promised in the advertising, and it burned and cut her face and arms. Had Plaintiff known that the Product was unable to prevent hair regrowth and could not live up to its other representations, Plaintiff would not have bought the Product.  As a result of Radiancy's conduct as alleged herein, Plaintiff suffered monetary injuries including but not limited to loss of the purchase price of the device and shipping and handling.

181)     Plaintiff Nancy Moore's husband, Stanley Moore, purchased the no!no! 8800 pink for her on or about December 7, 2012 after she viewed an infomercial in her home in Manassas, Virginia.  Plaintiff had seen advertisements for the Product for at least a year, and she asked for it as a Christmas present. Plaintiff relied on Defendant's misrepresentations in the infomercial that the device would have immediate results, that it could be used anywhere, that it was pain free, and that the results would be long term.  Plaintiff's primary reason for asking for the Product was Defendant's misrepresentation that it would provide permanent or long term hair removal. Plaintiff Nancy Moore reasonably relied on Defendant's representations in asking for the no!no! product, and Plaintiff Stanley Moore reasonably relied on Defendant's representations in purchasing the Product.

182)     Plaintiff Nancy Moore used the Product every day for a week at her home in Virginia and it did not remove any hair.  It also burned her and her niece, who she let use the Product.  Had Plaintiff Nancy Moore known that the Product was unable to prevent hair regrowth and could not live up to its other representations, she would not have asked her husband to buy her Product. Had Plaintiff Stanley Moore known that the Product was unable to live up to its representations, he would not have purchased the product for his wife.  As a result of Radiancy's conduct as alleged herein, Plaintiffs suffered monetary injuries including but not limited to loss of the purchase price of the device (approximately $269.85) and shipping and handling.

183)     Plaintiff Michele Uram purchased the no!no! 8800 silver on or about April 10, 2013 after viewing an infomercial in her home in Caraopolis, Pennsylvania.   Plaintiff saw advertisements for the Product several times before purchasing it.  She relied on Defendant's misrepresentations in the infomercial that stated that the device was easy to use and that hair would not regrow.   Plaintiff's primary reason for purchasing the Product was Defendant's

misrepresentation that the device would provide permanent or long term hair removal. Plaintiff reasonably relied on Defendant's representations in purchasing the no!no! product.

184)    Plaintiff Uram used the device for about a month at her home in Pennsylvania.  It was difficult to remove hair, and she found that it did not provide long term results, as hair grew back as quickly as it would have using regular hair removal methods such as shaving or waxing. Plaintiff tried to return the product to Radiancy, but customer service told her that Radiancy would send her a return label, but it never did.  Plaintiff called Radiancy several times to try to resolve the issue, but was not allowed to return the Product.  Had Plaintiff known that the Product was unable to prevent hair regrowth and could not live up to its other representations, Plaintiff would not have bought the Product.   As a result of Radiancy's conduct as alleged herein, Plaintiff suffered monetary injuries including but not limited to loss of the purchase price of the device (approximately $284.80) and shipping and handling.

185)    Plaintiff Kris Steinbauer purchased the no!no! 8800 silver on or about September 6, 2012 after viewing an infomercial in her home in Colorado Springs, Colorado.  Plaintiff had seen the infomercial several times, and finally decided to give the Product a try.  Plaintiff relied on Defendant's misrepresentations in the infomercial that the Product was painless, quick and easy to use, and that the hair would not regrow for a long time.  The infomercial Plaintiff Steinbauer saw has images of people who were still "hair free" six weeks after using the Product, among other misrepresentations.   Plaintiff's primary reason for purchasing the product was Defendant's misrepresentation that it would provide permanent or long term hair removal.  Plaintiff reasonably relied on Defendant's representations in purchasing the no!no! product.

186)    Plaintiff Steinbauer tried using the Product several times at her home in Colorado, but it burned her, had an unpleasant smell, and barely removed any hair.  The hair that the Product

did remove grew back as fast as it would have using regular hair removal methods such as shaving or depilatory creams.  Had Plaintiff known that the Product was unable to prevent hair regrowth and could not live up to its other representations, Plaintiff would not have bought the Product.  As a result of Radiancy's conduct as alleged herein, Plaintiff suffered monetary injuries including but not limited to loss of the purchase price of the device and shipping and handling.

187)    Plaintiff Juanita Humbertson purchased the product on or about November 4, 2012 after viewing a sponsored segment on HSN in her home in Falling Waters, West Virginia.  Plaintiff purchased the no!no! 8800 gold leopard and no!no! 8800 pink models as part of the Professional Hair Removal Glam Set, which included accessories such as extra buffer pads, moisturizer, after treatment cream, and a travel case.  This was the first time Plaintiff had seen the Product advertised. Plaintiff relied on Defendant's misrepresentations in the segment that the Product would remove hair without worry and maintenance and that hair removal would be permanent, among other misrepresentations.  Plaintiff's primary reason for purchasing the Product was Defendant's misrepresentation that the device would provide permanent or long term hair removal.  Plaintiff reasonably relied on Defendant's representations in purchasing the no!no! product.

188)    Plaintiff Humbertson used the Product every day for the first few weeks, and then two times per week for 90 days, at her home in West Virginia.  It did not remove very much hair, and what hair it did remove grew back as quickly as it would have had she used traditional hair removal methods such as shaving or waxing.  Plaintiff gave the second Product she purchased to her daughter, Andrea Humbertson, whom it shocked and left red marks on.  Had Plaintiff known that the Product was unable to prevent hair regrowth and could not live up to its other representations, Plaintiff would not have bought the Product.  As a result of Radiancy's conduct

as alleged herein, Plaintiff suffered monetary injuries including but not limited to loss of the purchase price of the device sets (approximately $499.00) and shipping and handling.

189)     Plaintiff Al Oliveria purchased the no!no! 8800 black on or about March 24, 2014 after viewing an infomercial in his home in Knoxville, Tennessee.  He saw the advertisement several times before deciding to buy the Product.  Plaintiff relied on Defendant's misrepresentations in the advertisement that stated that the device would remove hair on the arms and neck permanently, among other misrepresentations.  His primary reason for purchasing the Product was Defendant's misrepresentation that the device would provide permanent or long term hair removal. Plaintiff reasonably relied on Defendant's representations in purchasing the no!no! product.

190)     Plaintiff Oliveria used the device for 6 months, once or twice per week, at his home in Tennessee.  Although the product removed hair, it never slowed down regrowth, and it worked no better than regular hair removal methods such as shaving or waxing.  Plaintiff stopped using the product because it was burning his neck and leaving it red.  Had Plaintiff known that the Product was unable to prevent hair regrowth and could not live up to its other representations, Plaintiff would not have bought the Product.  As a result of Radiancy's conduct as alleged herein, Plaintiff suffered monetary injuries including but not limited to loss of the purchase price of the device (approximately $269.85) and shipping and handling.

## IV.  RULE 9(b) ALLEGATIONS

191)     WHO: Defendant Radiancy made material misrepresentations and failed to disclose, or adequately disclose, material facts as detailed herein.  Except as identified herein Plaintiff is unaware, and therefore unable to identify, the true names and identities of those individuals at Radiancy who are responsible for such material misrepresentations and omissions.

192)    WHAT: Defendant made material misrepresentations regarding the no!no! Hair such as that it was akin to "laser" hair removal or "professional" hair removal treatments, "superior" to shaving, and capable of permanent or "long term" hair removal by "suppressing" hair growth.  Specifically, Defendant represented to the Plaintiffs and similarly situated class members that: (1) the no!no! Hair "conducts heat down the hair shaft and into the follicle" and that "[l]ike laser and IPL [intense pulsed light] treatments, the heat gradually disrupts the hair growth cycle"; (2) the signal "disrupts the cell communication [responsible for stimulating hair growth] between the bulge and root"; (3) the no!no! Hair suppresses, slows, or reduces hair regrowth on a long-term or permanent basis; (4) this reduction of hair regrowth is substantial, "up to 94%"; (5) the no!no! Hair causes the hairs that grow back to be finer and lighter than before treatment; (6) the no!no! Hair operates like a laser and produces results comparable or even superior to the results delivered by lasers; (7) the no!no! Hair is a "professional" device embodying "Thermicon" technology; and (8) the no!no! Hair is backed by clinical studies purporting to support these representations.  Defendant omitted that the product was no more effective than a typical shaving device which was misleading because consumers would have never paid hundreds of dollars if that is what they were told.  Such disclosures should have been made at the time of the advertising of the Product.  As a result of the misrepresentations and omissions, Plaintiffs and class members paid moneys to Defendant which they otherwise would not have and which were wrongfully retained by Defendant.

193)    WHEN: Defendant has made the affirmative material misrepresentations, omissions, and non-disclosures as detailed herein continuously from the inception of the company's marketing campaign in 2007 and continues to do so through the present.

194)    WHERE: Defendant's affirmative, material misrepresentations, omissions, and non-disclosures as detailed herein were made on the Internet (including on the company's various websites), in infomercials sponsored by the company and shown widely on televisions across the United States, in marketing segments the company promoted on home television shopping networks, and in press releases and official company statements.

195)    HOW: Defendant made numerous, written and oral material misrepresentations on its website promotional pages, infomercials, and home shopping marketing segments that were designed to and did in fact mislead Plaintiffs and similarly situated class members to believe, among other things, that the no!no! device would lead to long term and effective hair removal.

196)    WHY: Defendant engaged in the aforementioned affirmative material misrepresentations and omissions for the express purpose of inducing Plaintiffs and similarly situated class members to purchase the no!no! device based on the belief that it could do things that it in fact could not and had characteristics which it did not.  By falsely and fraudulently marketing its products, Radiancy has been able to retain illicit profits from hundreds of thousands of consumers.

## VI.  CLASS ACTION ALLEGATIONS

197)    Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, individually and on behalf of a class defined as:

> All purchasers of the no!no! Hair removal device in the United States during the period January 1, 2007 until the present who purchased the product from Radiancy's toll free number, website, QVC, or the Home Shopping Network.

198)    Excluded from the Class are Radiancy, its affiliates, employees, officers and directors, the Judge(s) assigned to this case and the attorneys of record in this case, and all persons who returned the no!no! Hair device and received the return of their purchase price.

49

199)    Plaintiffs reserve the right to amend this class definition prior to class

certification.

200)    Alternatively, the Class includes individuals who are members of the following

subclasses:

a.  The "Virginia Subclass" is defined as:

> All members of the Class who were residents of Virginia at the time of their purchases.

b.  The "District of Columbia Subclass" is defined as:

> All members of the Class who were residents of District of Columbia at the time of their purchases.

c.  The "California Subclass" is defined as:

> All members of the Class who were residents of California at the time of their purchases.

d.  The "Maryland Subclass" is defined as:

> All members of the Class who were residents of Maryland at the time of their purchases.

e.  The "Florida Subclass" is defined as:

> All members of the Class who were residents of Florida at the time of their purchases.

f.  The "Illinois Subclass" is defined as:

> All members of the Class who were residents of Illinois at the time of their purchases.

g.  The "Tennessee Subclass" is defined as:

> All members of the Class who were residents of Tennessee at the time of their purchases.

h.  The "West Virginia Subclass" is defined as:

All members of the Class who were residents of West Virginia at the time of their purchases.

    i.    The "Colorado Subclass" is defined as:

All members of the Class who were residents of Colorado at the time of their purchases.

    j.    The "Pennsylvania Subclass" is defined as:

All members of the Class who were residents of Pennsylvania at the time of their purchases.

201)    The no!no! Hair device was purchased by millions of consumers nationally. Therefore the Class defined above is composed of many persons geographically dispersed throughout the United States, the joinder of whom in one action is impractical if not impossible. The Class is ascertainable and identifiable.

202)    Questions of law and fact common to the Class exist, as to the named Plaintiffs, as well as all other members of the Class.  These common legal and factual issues include, but are not limited to, the following:

    a.    Whether the no!no! Hair removal device lived up to its representations;

    b.    Whether Radiancy over-promoted the advantages of the no!no! Hair device;

    c.    Whether Radiancy omitted material information about the no!no! Hair removal device;

    d.    Whether Radiancy's promotion and sales of the no!no! Hair device were deceptive or misleading;

    e.    Whether Radiancy violated state consumer protection laws in the marketing and sales of the no!no! Hair device;

    f.    Whether Radiancy violated state warranty laws; and

    g.    Whether Radiancy violated the Magnuson-Moss Warranty Act.

203)    Plaintiffs will fairly and adequately protect the interests of the members of their Class and have no interests antagonistic to those of the Class.

204)    This class action is appropriate for certification because the above-listed questions of law and fact common to the Class will be most efficiently adjudicated in a common proceeding.  Adjudications regarding all of the common questions of law and fact are, as a practical matter, preclusive of the Class suit or would substantially impair a Class member's ability to protect their interests.

205)    Plaintiffs' claims are typical of the claims of members of the Class.  Plaintiffs and all members of the Class sustained similar damages (the cost of the device) arising out of Radiancy's common course of conduct complained of herein.

206)    Plaintiffs can fairly and adequately represent the members of the Class since Plaintiffs have no interests which are adverse to the interests of absent Class members.  Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.  The interests of member of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

207)    A class action is superior to other available means for the fair and efficient adjudication of this dispute.  The injury suffered by each Class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Radiancy economically feasible.  Even if Class members themselves could afford such individualized litigation, the court system could not.  In addition to the burden and expense of managing myriad actions arising from the fraudulent sale of the Product, individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case.  By contrast, the Class action device presents far fewer management

difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

208)     In the alternative, the Class may be certified because: (a) the prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members which would establish incompatible standards of conduct for Defendant and; (b) the prosecution of separate actions by individual Class member would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interest of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

209)     Alternatively, a class action is appropriate under Fed. R. Civ. P. 23(c)(4)(A) with respect to particular issues.

## VII.  CLAIMS

## COUNT ONE

## Violation of California Consumers Legal Remedies Act ("CLRA"), California Civil Code §§ 1750, et seq.

### (on behalf of the California Subclass)

210)     Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

211)     The CLRA's protections are cumulative and therefore are "in addition to any other procedures or remedies for any violation or conduct provided for in any other law."  Cal. Civ. Code § 1752.

212)    Defendant Radiancy is a "person" as that term is defined in Cal. Civ. Code § 1761 because each person is defined as an "individual, partnership, corporation, limited liability company, association, or other group, however organized."

213)    The sales and purchases of the Product as described herein were "transactions" as that term is defined in Cal. Civ. Code § 1761 because sales and purchases constituted an "agreement between a consumer and any other person, whether or not the agreement is a contract enforceable by action, and includes the making of, and the performance pursuant to, that agreement."

214)    The sales and purchases of the Product at issue involve "goods" as defined in Cal. Civ. Code § 1761 because they involved the sale and purchase of the no!no! Hair removal device, which are tangible chattel brought to be used primarily for personal, family, or household purposes.

215)    By entering into the subject transactions to purchase the no!no! Hair removal device, Plaintiffs and other members of the Class are "consumers" as defined in Cal. Civ. Code § 1761 because they sought to purchase the "goods" for personal, family, or household use.

216)    Defendant violated Cal. Civ. Code §§ 1770(a)(2), (5), (7), and (9).  These provisions state:

a.    The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:

(2)    Misrepresenting the source, sponsorship, approval, or certification of goods or services.

(5)    Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have  . . .

(7)      Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

(9)      Advertising goods or services with intent not to sell them as advertised.

217)    In violation of Cal. Civ. Code § 1770(a)(2), Defendant represented that the no!no! Hair removal device is "clinically proven" with long-term results which are "scientifically validated." Instead, as alleged, none of the three papers listed under the "clinical studies" section of Radiancy's website illustrate that the Product has been clinically approved. Defendant Radiancy does not cite nor have any scientific basis for its claims that the Product results in significant reduction of hair regrowth which long-term and permanent.

218)    In violation of Cal. Civ. Code § 1770(a)(5), Defendant falsely represented that the Product provides "up to 64 percent hair reduction," that "hair regrowth is reduced by up to 94 %" and that the device offers "a long-term solution to unwanted hair," among the many other representations described herein.

219)    In violation of Cal. Civ. Code § 1770(a)(7), Defendant represented that its Product was of a certain standard or quality, namely that the Product provided "laser-like results" and was suitable on all skin and hair types while costing less money than professional laser hair removal. Instead, as alleged herein, the comparison to "laser-like" technology was merely a deceptive attempt to equate the Product with a technology that has been actually proven to prevent hair regrowth.

220)    In violation of Cal. Civ. Code § 1770(a)(9), Defendant advertised that the Product uses the "Thermicon effect" by conducting heat down the hair shaft and into the follicle, which serves to inhibit future hair growth. Defendant use graphics and animations to illustrate this

"Thermicon effect" in infomercials.  Defendant engaged in this advertising and marketing campaign utilizing these representations, despite representing to the FDA that the Product had no effect below the skin's surface.

221)     Defendant's violations of the specific provisions detailed in Cal. Civ. Code § 1770 have caused damage to Plaintiffs and Class members and threaten additional injury if the violations continue.  The damage includes the loss of the advertised utility of the Product purchased by Plaintiffs and members of the Class, and the money and time expended by Plaintiffs and members of the Class in purchasing and testing the Product, which they wrongly expected would prevent unwanted hair growth.

222)     At this time, Plaintiffs and members of the Class seek injunctive relief under this cause of action.  By letter dated April 16, 2014, mailed via certified mail as directed in Cal. Civ. Code § 1782, Plaintiffs notified Defendant of their violations of the CLRA and demanded that Defendant provide a remedy that addresses its wrongful conduct.  (See Exhibit 1).

223)     Plaintiffs seek injunctive relief and damages.

224)     A venue affidavit pursuant to Cal. Civil Code § 1780(d) attesting that Radiancy does business in this jurisdiction is attached as Exhibit 2.


**COUNT TWO**

**Violation of California Unfair Competition Law ("UCL"), California Business & Professional Code §§ 17200, et seq.**

**(on behalf of the California Subclass)**

225)     Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

226)     Plaintiffs bring this action on an individual basis, on behalf of the Class, and on

behalf of the general public pursuant to the UCL.

227)     Plaintiffs and members of the Class purchased the Product for $250.00 or more in

order to achieve permanent or long term hair removal, alleviating the need to shave.  Plaintiffs

and members of the Class believed the Product was laser-like and could permanently prevent

unwanted hair regrowth by impacting hair follicles.

228)     If Plaintiffs and members of the Class knew that usage of the Product would not

result in permanent hair reduction and was no better than shaving, they reasonably would not

have purchased the Product.  Plaintiffs and Class members would have purchased a regular razor,

commonly sold for $2, rather than spending more than $250 or more on a Product that would be

comparable to a basic razor in its effectiveness of removing unwanted hair.  Defendant therefore

obtained an unfair competitive advantage and obtained Plaintiff's and Class members' business

unfairly under Cal. Bus. & Prof. Code § 17200(2).

229)     Defendant engaged in an unfair and/or unlawful business act or practice as

defined in Cal. Bus. & Prof. Code § 17200(3) by continuing to sell and market the Product with

all of the representations and warranties described herein, and in failing to ensure that the

Product fulfilled the obligations of these representations and warranties, despite knowing that the

Product did not operate as a "laser," did not impact the hair follicle, and was not capable of

achieving "permanent" or long term hair removal in its users, was not proven by clinical studies,

was not comparable to professional hair removal, and was no better than shaving.

230)     Defendant engaged in an unfair, deceptive, untrue, or misleading advertising

under Cal. Bus. & Prof. Code § 17200(4) by warranting in infomercials, on its website, and on

product packaging and labels, that the Product was capable of achieving permanent or long term

hair removal, that the product impacted hair follicles, that the product was proven by clinical studies, that the Product was akin to "laser" hair removal, that the Product was "superior" to shaving, and that the Product could be comparable to "professional" hair removal treatments at a much lower cost, among other false and misleading claims.  In fact, the Product does not lead to any significant reduction in hair regrowth and is comparable to a regular shaver, razor, or hair clipper.

231)    In addition, by failing to make consumers aware that the Product, which is sold at prices in excess of $250.00, had the overall effectiveness of a regular $2 razor, Defendant Radiancy has been able to obtain and retain consumers' money.

232)    As a result of Defendant's widespread advertising blitz, Plaintiffs and other consumers could not have reasonably avoided or anticipated Defendant's failure to provide a Product that was manufactured to work as claimed in numerous advertisements.  The substantial harm caused by Defendant's business practices outweighs any benefit, justification, or motivation of Defendant.

233)    In addition to being unfair, Defendant's business practices were unlawful as they violated the CLRA and breached express and implied warranties that Defendant had with Plaintiff and members of the Class.

234)    California law does not provide any safe harbor for Defendant's misconduct.

235)    The acts complained of herein constitute unfair and unlawful business practices in violation of Cal. Bus. & Prof. Code § 17200, et seq.  Such acts and violations have not abated and will continue to occur unless enjoined.

236)    The practices set forth above have and continue to injure Plaintiff, the Class, and the general public and cause the loss of money.  These violations have unjustly enriched

Defendant at the expense of Plaintiff and the Class.  As a result, Plaintiff, the Class, and the general public at large are entitled to damages, injunctive relief, restitution, and other equitable relief deemed appropriate by this Court.

## COUNT THREE

### Violation of False Advertising Law ("FAL"), California Business & Professional Code §§ 17500, et seq.

**(on behalf of the California Subclass)**

237)   Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

238)   Plaintiffs and members of the Class purchased the Product for $250 or more in order to achieve permanent or long term hair removal.  Plaintiffs and members of the Class believed the Product was laser-like and could permanently prevent unwanted hair regrowth, was proven by clinical studies, and was superior to shaving.

239)   Plaintiffs and other members of the California Subclass are "persons" within the meaning of Cal. Bus. Prof. Code § 17204.

240)   Defendant unfairly obtained monies from Plaintiffs and the other members of the California Subclass through (i) unlawful business acts and/or practices; (ii) unfair business acts and/or practices; (iii) fraudulent business acts and/or practices; and (iv) unfair, deceptive, untrue and/or misleading advertising (including violations of Cal. Bus. & Prof. Code § 17500, et seq.), when it marketed, promoted, and advertised the Product as, among other things, akin to "laser" hair removal, "superior" to shaving, and capable of long term or "permanent" hair removal by suppressing hair regrowth.

241)   Through a massive and deceptive television and Internet advertising campaign, as well as on product packaging and labels, Defendant falsely represented that the Product would

inhibit future hair growth through the "Thermicon effect" – a technology that would conduct heat down the hair shaft and into the follicle, thereby disrupting the hair growth cycle.   Defendant also misrepresented that the Product was comparable to "professional" hair removal treatments, was "clinically proven," and that the purported long-term results were "scientifically validated."

242)    Defendant willfully engaged in the unfair and/or deceptive acts and/or practices described above and knew or should have known that those acts and/or practices were unfair and/or deceptive.

243)    As a result of Defendant's actions, Plaintiff and Class members have been injured and are entitled to injunctive relief, restitution, and other equitable relief deemed appropriate by this Court.

## COUNT FOUR

### Violation of D.C. Code § 28-3901, *et seq*. of the Consumer Protections Procedures Act

### (on behalf of the District of Columbia Subclass)

244)    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

245)    Plaintiffs bring this Complaint on behalf of a class of consumers, as defined in D.C. Code § 28-3901(2), who have been affected by the Defendant's unfair business practices. Plaintiff is a consumer as defined in D.C. Code § 28-3901(2), with the respect to the purchase of goods from Defendant.

246)    Defendant is a merchant as defined in D.C. Code § 28-3901(3), with respect to the sale of consumer goods or services.

247)    Defendant's advertisements, as set forth in its infomercials and on its website, constitute "trade practices" as defined by D.C. Code § 28-3901(6).

248)    Defendant intentionally misrepresented and/or intentionally omitted material facts in order to convince Plaintiffs and members of the Class to purchase the Product.  Defendant is a person and/or merchant, as defined in D.C. Code § 28-3901(a)(1) and (3), whose actions in failing to reveal, and in deliberating concealing, the fact that the Product offered no more "permanent" or long term hair removal than a regular $2 razor, among other concealments, suppressions and omissions of material facts, constitute unlawful trade practices under D.C. Code §§ 28-3904(a), (d), (e), (f), and (h).

249)    In particular, Defendant engaged in an unfair, deceptive, untrue, or misleading advertising by warranting in infomercials, on Radiancy's website, and on product packaging and labels, that the Product was capable of achieving permanent or long term hair removal, that the product impacted hair follicles, that the product was proven by clinical studies, that the Product was akin to "laser" hair removal, that the Product was "superior" to shaving, and that the Product could be comparable to "professional" hair removal treatments at a much lower cost, among other false and misleading claims.  In fact, the Product does not lead to any significant reduction in hair regrowth and is comparable to a regular shaver, razor, or hair clipper.

250)    Plaintiffs and members of the Class were deceived by Defendant's intentional misrepresentations and omissions, including by the orchestrated claims made on television infomercials, website, and on product labels and packaging regarding the effectiveness of the Product in achieving near 100% permanent or long term reduction of hair regrowth, among other claims described herein.

251)    As a direct and proximate result of the unlawful trade practices of Defendant, Plaintiffs and members of the Class practices set forth above have been financially damaged. Defendant has been unjustly enriched at the expense of Plaintiff and the Class.  As a result,

Plaintiff, the Class, and the general public at large are entitled to injunctive relief, restitution, and other equitable relief deemed appropriate by this Court.

## COUNT FIVE

### Violation of Florida Deceptive and Unfair Trade Practices Act, F.S.A.T. XXXIII, Ch. 501, Pt. II, *et. seg.*

**(on behalf of the Florida Subclass)**

252)     Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

253)     Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§501.201-501.213, provides that unfair or deceptive acts and practices in the conduct of any "trade or commerce" are unlawful.  Fla. Stat. §501.204.  Under the FDUTPA, "trade or commerce" is defined broadly to include the "advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property."  Fla. Stat. §501.203(8).

254)     Defendant employed practices that are unfair and deceptive.  In particular, Defendant engaged in an unfair, deceptive, untrue, or misleading advertising by warranting in infomercials, on Radiancy's website, and on product packaging and labels, that the Product was capable of achieving permanent or long term hair removal, that the product impacted hair follicles, that the product was proven by clinical studies, that the Product was akin to "laser" hair removal, that the Product was "superior" to shaving, and that the Product could be comparable to "professional" hair removal treatments at a much lower cost, among other false and misleading claims.  In fact, the Product does not lead to any significant reduction in hair regrowth and is comparable to a regular shaver, razor, or hair clipper.

255)     Plaintiffs and members of the Class were deceived by Defendant's misrepresentations, deceptions, and omissions, and, as a result, purchased the Product at a cost that greatly exceeded the price for a regular razor.  To date, Plaintiffs have not received the benefit of their bargain in that the Product has not achieved its stated promise of significantly reducing hair regrowth and functioning in the same way as "laser" hair removal.

256)     Plaintiffs and members of the Class have been damaged as a direct and proximate result of the Defendant's unfair and deceptive acts.

257)     As a result of the foregoing conduct, Plaintiff, the Class, and the general public at large are entitled to injunctive relief, restitution, and other equitable relief deemed appropriate by this Court.

## COUNT SIX

### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et. seq.*

### (on behalf of the Illinois Subclass)

258)     Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

259)     At all relevant times, Plaintiffs and Defendant were persons within the meaning of 815 ILCS 505/1(c).

260)     At all relevant times, Plaintiff and members of the Class were consumers within the meaning of 815 ILCS 505/1(e).

261)     At all relevant and material times as described herein, Defendant conducted trade and commerce within the meaning of 815 ILCS 505/1(f).

262)    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS

505/1, et seq. provides:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practices described in Section 2 of the 'Uniform Deceptive Trade Practices Act', approved August 6, 1965, in conduct of any trade or commerce are hereby declared unlawful, whether any person has in fact been mislead, deceived, or damaged thereby.

263)    In particular, Defendant engaged in an unfair, deceptive, untrue, or misleading

advertising by warranting in infomercials, on Radiancy's website, and on product packaging and

labels, that the Product was capable of achieving permanent or long term hair removal, that the

product impacted hair follicles, that the product was proven by clinical studies, that the Product

was akin to "laser" hair removal, that the Product was "superior" to shaving, and that the Product

could be comparable to "professional" hair removal treatments at a much lower cost, among

other false and misleading claims.  In fact, the Product does not lead to any significant reduction

in hair regrowth and is comparable to a regular shaver, razor, or hair clipper.

264)    The facts which Defendant misrepresented and/or concealed, as alleged in the

preceding paragraphs, were material to Plaintiffs' decision about whether to purchase the

Product, in that Plaintiff would not have purchased the no!no! device at a price of more than

$250.00 but for Defendant's unfair and/or deceptive acts and/or practices.

265)    The misrepresentation and/or deception alleged herein occurred in connection

with Defendant's conduct of trade and commerce in Illinois.

266)    Defendant intended for Plaintiff and members of the Class to purchase the

Product in reliance upon Defendant's unfair and/or deceptive acts and/or practices in the

advertising, marketing, and sale of the no!no! hair removal device.

267)    As a direct and proximate result of Defendant's unfair and/or deceptive acts,

Plaintiff and members of the Class have been financially damaged by their purchases of the

Product.  Defendant has been unjustly enriched at the expense of Plaintiff and the Class.  As a

result, Plaintiff, the Class, and the general public at large are entitled to injunctive relief,

restitution, and other equitable relief deemed appropriate by this Court.

## COUNT SEVEN

### Violation of the Maryland Consumer Protection Act, MD. COML, Sec. 13-101, *et seq*.

### (on behalf of the Maryland Subclass)

268)    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged

herein.

269)    Maryland's Consumer Protection Act, Md. Code Ann., Comm Law. § 13-101, et

seq., prohibits any "person" from engaging in unfair or deceptive trade practices. §§ 13-103.

270)    Defendant is defined as a "person" under Md. Code Ann., Comm Law. § 13-

101(h) and therefore is prohibited from engaging in unfair and deceptive trade practices.

271)    Defendant engaged in unfair and deceptive trade practices in violation of Md.

Code Ann., Comm Law. § 13-301(1), (2)(i), (2)(iv), and (9)(i). In particular, Defendant engaged

in an unfair, deceptive, untrue, or misleading advertising by warranting in infomercials, on

Radiancy's website, and on product packaging and labels, that the Product was capable of

achieving permanent or long term hair removal, that the product impacted hair follicles, that the

product was proven by clinical studies, that the Product was akin to "laser" hair removal, that the

Product was "superior" to shaving, and that the Product could be comparable to "professional"

hair removal treatments at a much lower cost, among other false and misleading claims.  In fact,

the Product does not lead to any significant reduction in hair regrowth and is comparable to a regular shaver, razor, or hair clipper.

272)    As a result of Defendant's unfair and deceptive trade practices, Plaintiff and members of the Class were induced to purchase the Product, paying a much higher cost to Defendant Radiancy than they would have paid but for Defendant's unfair and deceptive conduct.

273)    As a direct and proximate result of Defendant's unfair and/or deceptive acts, Plaintiff and members of the Class have been financially damaged by their purchases of the Product.  Defendant has been unjustly enriched at the expense of Plaintiff and the Class.  As a result, Plaintiff, the Class, and the general public at large are entitled to injunctive relief, restitution, and other equitable relief deemed appropriate by this Court.

## COUNT EIGHT

### Violation of the Virginia Consumer Protection Act, Va. Code Ann. 59.1-196, *et. seq.*

### (on behalf of the Virginia Subclass)

274)    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

275)    Defendant engaged in "consumer transactions" with Plaintiff and members of the Class within the meaning of the Virginia Consumer Protection Act (Va. Code 59.1-198).

276)    Plaintiff and other members of the Class purchased the no!no! hair removal device from the Defendant, which constitutes "goods" within the meaning of the Virginia Consumer Protection Act (Va. Code 59.1-198).

277)    Defendant misrepresented that the Product had certain characteristics that were of a particular standard, quality, or grade; and committed various other acts of deception, false

promise, or misrepresentations in connection with the consumer transaction.  Among other things, Defendant's advertising misrepresented that the Product was effective in suppressing long-term hair regrowth; that the reduction in regrowth was "up to 94 %" and established by clinical studies; and that the Product was of a quality and grade that equaled "laser" hair removal.  Defendant's advertising concealed that the no!no! hair removal device, in reality, only operated with the effectiveness of a regular razor in permanently removing hair.

278)    In particular, Defendant engaged in an unfair, deceptive, untrue, or misleading advertising by warranting in infomercials, on Radiancy's website, and on product packaging and labels, that the Product was capable of achieving permanent or long term hair removal, that the product impacted hair follicles, that the product was proven by clinical studies, that the Product was akin to "laser" hair removal, that the Product was "superior" to shaving, and that the Product could be comparable to "professional" hair removal treatments at a much lower cost, among other false and misleading claims.  In fact, the Product does not lead to any significant reduction in hair regrowth and is comparable to a regular shaver, razor, or hair clipper.

279)    Defendant willfully engaged in these deceptive and unfair acts and practices, in that it knew, or should have known, that the methods, acts, or practices alleged herein were deceptive and unfair.  Defendant failed to disclose material information that would have effected Plaintiffs' and Class Members' decisions to purchase the no!no! hair removal device.

280)    As a direct and proximate result of Defendant's unfair and deceptive trade practices, Plaintiff and other Members of the Class were deceived into purchasing the Product and have been damaged thereby. Defendant has been unjustly enriched at the expense of Plaintiff and the Class.  As a result, Plaintiff, the Class, and the general public at large are entitled to injunctive relief, restitution, and other equitable relief deemed appropriate by this Court.

## COUNT NINE

### Violation of the Colorado Consumer Protection Act, Col. Rev. Stat. 6-1-105(1), et seq.

### (on behalf of the Colorado Subclass)

281)     Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

282)     The no!no! hair removal device that Plaintiff and other members of the Class purchased from Defendant is defined as a "good" within the meaning of Col. Rev. Stat. 6-1-105(1).

283)     Defendant is a "person" within the meaning of Col. Rev. Stat. 6-1-105(1).

284)     Defendant's sale of the Product to Plaintiff and members of the Class occurred in the "course of [its] business" within the meaning of Col. Rev. Stat. 6-1-105(1).

285)     Plaintiff and members of the Class are "actual consumers" as defined within the meaning of Col. Rev. Stat. 6-1-113(1)(a).

286)     Plaintiff and members of the Class have been injured by Defendant's deceptive practices in violation of Col. Rev. Stat. 6-1-105(1), *et seq.*  In particular, Defendant engaged in an unfair, deceptive, untrue, or misleading advertising by warranting in infomercials, on Radiancy's website, and on product packaging and labels, that the Product was capable of achieving permanent or long term hair removal, that the product impacted hair follicles, that the product was proven by clinical studies, that the Product was akin to "laser" hair removal, that the Product was "superior" to shaving, and that the Product could be comparable to "professional" hair removal treatments at a much lower cost, among other false and misleading claims.  In fact, the Product does not lead to any significant reduction in hair regrowth and is comparable to a regular shaver, razor, or hair clipper.

287)     Defendant willfully, knowingly, and fraudulently engaged in the deceptive acts and/or practices described above.

288)     As a direct and proximate result of Defendant's deceptive acts described above, Plaintiffs and members of the Class paid more for the no!no! hair removal device than they would have, and/or purchased a product they would not have purchased, but for Defendant's deceptive conduct.  Plaintiff and members of the Class are entitled to damages, among other relief, as Defendant has been unjustly enriched at the expense of Plaintiff and the Class.  As a result, Plaintiff, the Class, and the general public at large are entitled to injunctive relief, restitution, and other equitable relief deemed appropriate by this Court.

**COUNT TEN**

**Violation of Pennsylvania Unfair Trade Practices and
Consumer Protection Law, § 201-1, *et seq.***

**(on behalf of the Pennsylvania Subclass)**

289)     Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

290)     Defendant is a "person" within the meaning of § 201-2(2).

291)     Defendant engaged in "trade" and "commerce" within the meaning of § 201-2(3) by advertising, offering for sale, selling, and distributing its no!no! hair removal device to the people of the Commonwealth.

292)     Plaintiff and members of the Class have been injured by Defendant's deceptive practices in violation of § 201-2(4).  In particular, Defendant engaged in an unfair, deceptive, untrue, or misleading advertising by warranting in infomercials, on its website, and on product packaging and labels, that the Product was capable of achieving permanent or long term hair

removal, that the product impacted hair follicles, that the product was proven by clinical studies,

that the Product was akin to "laser" hair removal, that the Product was "superior" to shaving, and

that the Product could be comparable to "professional" hair removal treatments at a much lower

cost, among other false and misleading claims.  In fact, the Product does not lead to any

significant reduction in hair regrowth and is comparable to a regular shaver, razor, or hair

clipper.

293)    These misrepresentations and concealments specifically violated § 201-2(4)(ii), §

201-2(4)(iii), § 201-2(4)(v), § 201-2(4)(vii), and § 201-2(4)(xxi).

294)    Defendant willfully, knowingly, and fraudulently engaged in the deceptive acts

and/or practices described above.

295)    As a direct and proximate result of Defendant's deceptive acts described above,

Plaintiffs and members of the Class paid more for the no!no! hair removal device than they

would have, and/or purchased a product they would not have purchased, but for Defendant's

deceptive conduct.  Plaintiff and members of the Class are entitled to damages, among other

relief, as Defendant has been unjustly enriched at the expense of Plaintiff and the Class.  As a

result, Plaintiff, the Class, and the general public at large are entitled to injunctive relief,

restitution, and other equitable relief deemed appropriate by this Court.

## COUNT ELEVEN

### Breach of Express Warranty

### (on behalf of the Nationwide Class and each state Subclass)

296)    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged

herein.

Case 1:15-cv-01142-ABJ   Document 1   Filed 07/16/15   Page 71 of 76

297)     Defendant Radiancy is a merchant as defined by applicable Uniform Commercial Code ("U.C.C.") provisions and sold no!no! Hair to Plaintiffs and members of the Class.

298)     Defendant is in privity with Plaintiffs and members of the Class as Defendant sold them the products directly or through an agent, by reason of its express written warranty which created a direct contractual relationship between the parties, and/or as third party beneficiaries of any privity relationship that Defendant had with its merchants from whom Plaintiffs may have purchased their Products.

299)     Defendant expressly warranted via its advertising, promotional statements, product inserts, labeling, website information, public statements, and other representations that, among other things, (1) no!no! provided permanent or long term results by reducing hair density and preventing regrowth; (2) no!no! disrupts the hair cycle by heating the follicle through its Thermicon technology; (3) no!no! was comparable to our better than laser hair removal treatments and other professional treatments; (4) no!no! could be used anywhere on the entire body; and (5) no!no! was clinically proven to work and backed by independent scientific research.

300)     The statements made by Defendant are affirmations of fact that became part of the basis of the bargain and created an express warranty that the goods would conform to the stated promises.  Plaintiffs placed importance on and/or relied on Defendant's representations.

301)     Defendant's no!no! Hair products did not conform to Defendant's express representations.

302)     Defendant had reasonable and adequate notice of the Plaintiffs and the Class Members' claims for breach of express warranty and failed to cure. *See* Exhibit 1.

303)      As a result of Defendant's breaches of express warranty, Plaintiff and members of the Class have been injured and are entitled to equitable/injunctive relief and/or damages in a measure and amount which are to be determined at trial.

## COUNT TWELVE

### Breach of Implied Warranty of Merchantability

**(on behalf of the Nationwide Class and each state Subclass)**

304)      Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

305)      Defendant Radiancy is a merchant as defined by applicable Uniform Commercial Code ("U.C.C.") provisions and sold no!no! Hair to Plaintiffs and members of the Class.

306)      Defendant is in privity with Plaintiffs and members of the Class as Defendant sold them the products directly or through an agent, by reason of their express written warranty which created a direct contractual relationship between the parties, and/or as third party beneficiaries of any privity relationship that Defendant had with merchants from whom Plaintiffs may have purchased their Products.

307)      Defendant impliedly warranted to Plaintiffs and members of the Class that the no!no!Hair was merchantable and fit for use.  Specifically, Defendant impliedly warranted that (1) no!no! provided permanent or long term results by reducing hair density and preventing regrowth; (2) no!no! disrupts the hair cycle by heating the follicle through its Thermicon technology; (3) no!no! was comparable to our better than laser hair removal treatments and other professional treatments; (4) no!no! could be used anywhere on the entire body; and (5) no!no! was clinically proven to work and backed by independent scientific research.

308)      Defendant breached the implied warranties.

309)      Defendant's breach of these warranties deprived Plaintiffs and other Class

members of the benefits of their bargains.

310)      Defendant had reasonable and adequate notice of the Plaintiffs and the Class

Members' claims for breach of implied warranty of merchantability and failed to cure.  *See*

Exhibit 1.

311)      As a result of Defendant's breaches of implied warranty, Plaintiff and members of

the Class have been injured and are entitled to equitable/injunctive relief and/or damages in a

measure and amount which are to be determined at trial.


**COUNT THIRTEEN**

**Violation of the Magnuson-Mass Warranty Act, 15 U.S.C. §§ 2301, et seq.**

**(Asserted by the Nationwide Class)**

312)      Plaintiffs incorporate by reference and reallege all of the paragraphs previously

alleged herein.

313)      Plaintiffs bring this claim individually and on behalf of the other Class members

against Defendant Radiancy.

314)      Plaintiffs and other Class members are "consumers" within the meaning of the

Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

315)      Defendant Radiancy is a "supplier" and "warrantor" within the meaning of 15

U.S.C. §§ 2301(4)-(5).

316)      Defendant's no!no! hair removal device purchased by Plaintiffs and members of

the Class constitutes a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

317)      Defendant impliedly warranted to Plaintiffs and members of the Class that the

no!no!Hair was merchantable and fit for use.  Specifically, Defendant impliedly warranted that

(1) no!no! provided permanent or long term results by reducing hair density and preventing regrowth; (2) no!no! disrupts the hair cycle by heating the follicle through its Thermicon technology; (3) no!no! was comparable to our better than laser hair removal treatments and other professional treatments; (4) no!no! could be used anywhere on the entire body; and (5) no!no! was clinically proven to work and backed by independent scientific research..

318)     Defendant breached these implied warranties.

319)     Defendant's breach of these warranties deprived Plaintiffs and other Class members of the benefits of their bargains.

320)     The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this lawsuit.

321)     Defendant had reasonable and adequate notice of the Plaintiffs and the Class Members' claims for breach of implied warranty of merchantability and failed to cure.  *See* Exhibit 1.

322)     As a result of Defendant's breaches of implied warranty, Plaintiff and members of the Class have been injured and are entitled to equitable/injunctive relief and/or damages in a measure and amount which are to be determined at trial.

## REQUEST FOR A JURY TRIAL

323)     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

A.    Declaring that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, direct that reasonable notice of this action, as provided by Rule 23 of the Federal Rules of Civil Procedure, be given to all Class members, certifying the Class as requested herein, designating Plaintiffs as Class Representatives, and appointing their undersigned counsel as Class Counsel;

B.    That Defendant's false, deceptive, and misleading statements alleged herein be adjudged as violations of the various state consumer protection statutes and permanently enjoined;

C.    That Defendant be deemed to have breached applicable express and implied warranties and the Magnuson-Moss Warranty Act;

D.    That Plaintiffs and each of the other Class members recover compensatory, statutory, and/or punitive damages, and that judgments in favor of Plaintiffs and the other Class members be entered against Defendant Radiancy;

E.    That Plaintiffs and the other Class members recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

F.    That Plaintiffs and the other Class members be granted such other equitable, further, and different relief as the nature of the case may require or as may be deemed just and proper by this Court.

Dated July 17, 2015

/s/ James Pizzirusso
James Pizzirusso #477604
Stephanie Berger #1023976
HAUSFELD, LLP
1700 K Street N.W., Suite 650
Washington, D.C. 20006
Telephone: (202)540-7200
Facsimile: (202)540-7201
jpizzirusso@hausfeld.com
sberger@hausfeld.com

Aaron M. Levine, #7864
Brandon J. Levine, #412130
**AARON LEVINE & ASSOCIATES**
1111 16th Street N.W., Suite 400
Washington, D.C. 20036
Telephone: (202)833-8040
Facsimile: (202)833-8046
aaronlevinelaw@gmail.com

Patrick A. Malone, #397142
**PATRICK MALONE & ASSOCIATES**
1111 16th Street N.W., Suite 400
Washington, D.C. 20036
Telephone: (202)742-1500
Facsimile: (202)742-1515
pmalone@patickmalonelaw.com

Counsel for Plaintiffs and the Class